## DOE *v.* UNITED STATES

No. 86–1753. Argued March 2, 1988—Decided June 22, 1988

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, 219.

*Richard E. Timbie* argued the cause for petitioner. With him on the briefs were *Cono R. Namorato, Scott D. Michel,* and *Jeffrey S. Lehman.*

*Charles A. Rothfeld* argued the cause for the United States. With him on the brief were *Solicitor General Fried, Assistant Attorney General Rose, Deputy Solicitor General Bryson, Gary R. Allen, Robert E. Lindsay,* and *Alan Hechtkopf.*\*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the question whether a court order compelling a target of a grand jury investigation to authorize foreign banks to disclose records of his accounts, without identifying those documents or acknowledging their existence, violates the target's Fifth Amendment privilege against self-incrimination.

I

Petitioner, named here as John Doe, is the target of a federal grand jury investigation into possible federal offenses arising from suspected fraudulent manipulation of oil cargoes and receipt of unreported income. Doe appeared before the grand jury pursuant to a subpoena that directed him to produce records of transactions in accounts at three named banks in the Cayman Islands and Bermuda. Doe produced some bank records and testified that no additional records re-

---

\**Rex E. Lee, Joseph B. Tompkins, Jr.,* and *Carter G. Phillips* filed a brief for the Government of the Cayman Islands as *amicus curiae.*

sponsive to the subpoena were in his possession or control. When questioned about the existence or location of additional records, Doe invoked the Fifth Amendment privilege against self-incrimination.

The United States branches of the three foreign banks also were served with subpoenas commanding them to produce records of accounts over which Doe had signatory authority. Citing their governments' bank-secrecy laws, which prohibit the disclosure of account records without the customer's consent,[1] the banks refused to comply. See App. to Pet. for Cert. 17a, n. 2. The Government then filed a motion with the United States District Court for the Southern District of Texas that the court order Doe to sign 12 forms consenting to disclosure of any bank records respectively relating to 12 foreign bank accounts over which the Government knew or suspected that Doe had control. The forms indicated the account numbers and described the documents that the Government wished the banks to produce.

The District Court denied the motion, reasoning that by signing the consent forms, Doe would necessarily be admit-

---

[1] It is a criminal offense for a Cayman bank to divulge any confidential information with respect to a customer's account unless the customer has consented to the disclosure. See the 1976 Confidential Relationships (Preservation) Law No. 16, as amended, 1979 CAY. IS. LAWS, ch. 26, §§ 3, 4 (Cayman Islands bank-secrecy law).

Apparently, Bermuda common law has been interpreted as imposing an implied contract of confidentiality between a Bermuda bank and its customers, pursuant to which "no Bermuda bank may release information in its possession concerning its customers' affairs unless (1) it is ordered to do so by a court of competent jurisdiction in Bermuda, or (2) it receives a specific written direction from its customer requesting the bank to release such information." Letter dated August 1, 1984, from Richard A. Bradspies, Vice President-Operations, of the Bank of Bermuda International Ltd., to David Geneson, Esq., Fraud Section, Criminal Division, U. S. Dept. of Justice, Respondent's Exhibit 4; Respondent's Notice of Disclosure of 6(e) Materials, 2 Record 307.

The Government has not yet sought contempt sanctions against the banks.

ting the existence of the accounts. The District Court believed, moreover, that if the banks delivered records pursuant to the consent forms, those forms would constitute "an admission that [Doe] exercised signatory authority over such accounts." *Id.*, at 20a. The court speculated that the Government in a subsequent proceeding then could argue that Doe must have guilty knowledge of the contents of the accounts. Thus, in the court's view, compelling Doe to sign the forms was compelling him "to perform a testimonial act that would entail admission of knowledge of the contents of potentially incriminating documents," *id.*, at 20a, n. 6, and such compulsion was prohibited by the Fifth Amendment. The District Court also noted that Doe had not been indicted, and that his signing of the forms might provide the Government with the incriminating link necessary to obtain an indictment, the kind of "fishing expedition" that the Fifth Amendment was designed to prevent. *Id.*, at 21a.

The Government sought reconsideration. Along with its motion, it submitted to the court a revised proposed consent directive that was substantially the same as that approved by the Eleventh Circuit in *United States* v. *Ghidoni*, 732 F. 2d 814, cert. denied, 469 U. S. 932 (1984). The form purported to apply to any and all accounts over which Doe had a right of withdrawal, without acknowledging the existence of any such account.[2] The District Court denied this motion also, rea-

---

[2] The revised consent form reads:

"I, ——, of the State of Texas in the United States of America, do hereby direct any bank or trust company at which I may have a bank account of any kind or at which a corporation has a bank account of any kind upon which I am authorized to draw, and its officers, employees and agents, to disclose all information and deliver copies of all documents of every nature in your possession or control which relate to said bank account to Grand Jury 84–2, empaneled May 7, 1984 and sitting in the Southern District of Texas, or to any attorney of the District of Texas, or to any attorney of the United States Department of Justice assisting said Grand Jury, and to give evidence relevant thereto, in the investigation conducted by Grand Jury 84–2 in the Southern District of Texas, and this shall be ir-

soning that compelling execution of the consent directive might lead to the uncovering and linking of Doe to accounts that the grand jury did not know were in existence. The court concluded that execution of the proposed form would "admit signatory authority over the speculative accounts [and] would implicitly authenticate any records of the speculative accounts provided by the banks pursuant to the consent." App. to Pet. for Cert. 13a, n. 7.

The Court of Appeals for the Fifth Circuit reversed in an unpublished *per curiam* opinion, judgt. order reported at 775 F. 2d 300 (1985). Relying on its intervening decision in *In re United States Grand Jury Proceedings (Cid)*, 767 F. 2d 1131 (1985), the court held that Doe could not assert his Fifth Amendment privilege as a basis for refusing to sign the consent directive, because the form "did not have testimonial significance" and therefore its compelled execution would not violate Doe's Fifth Amendment rights. App. to Pet. for Cert. 7a.[3]

On remand, the District Court ordered petitioner to execute the consent directive. He refused. The District Court accordingly found petitioner in civil contempt and ordered

revocable authority for so doing. This direction has been executed pursuant to that certain order of the United States District Court for the Southern District of Texas issued in connection with the aforesaid investigation, dated ——. This direction is intended to apply to the Confidential Relationships (Preservation) Law of the Cayman Islands, and to any implied contract of confidentiality between Bermuda banks and their customers which may be imposed by Bermuda common law, and shall be construed as consent with respect thereto as the same shall apply to any of the bank accounts for which I may be a relevant principal." App. to Pet. for Cert. 12a, n. 5.

[3] The Court of Appeals, citing *United States* v. *New York Telephone Co.*, 434 U. S. 159, 174 (1977), held that the All Writs Act, 28 U. S. C. § 1651(a), authorized the District Court to consider the Government's motion to compel Doe's execution of the consent form, since that compulsion would facilitate the enforcement of the grand jury subpoenas served on the banks. App. to Pet. for Cert. 6a–7a. Petitioner has not challenged the Court of Appeals' conclusion regarding the District Court's authority for entering its order, and we do not address that issue here.

that he be confined until he complied with the order. *Id.*, at 2a. The court stayed imposition of sanction pending appeal and application for writ of certiorari. *Id.*, at 2a–3a.

The Fifth Circuit affirmed the contempt order, again in an unpublished *per curiam*, concluding that its prior ruling constituted the "law of the case" and was dispositive of Doe's appeal. *Id.*, at 3a; judgt. order reported at 812 F. 2d 1404 (1987). We granted certiorari, 484 U. S. 813 (1987), to resolve a conflict among the Courts of Appeals as to whether the compelled execution of a consent form directing the disclosure of foreign bank records is inconsistent with the Fifth Amendment.[4] We conclude that a court order compelling the execution of such a directive as is at issue here does not implicate the Amendment.

## II

It is undisputed that the contents of the foreign bank records sought by the Government are not privileged under the Fifth Amendment. See *Braswell* v. *United States, ante,* at 108–110; *United States* v. *Doe,* 465 U. S. 605 (1984); *Fisher* v. *United States,* 425 U. S. 391 (1976). There also is no question that the foreign banks cannot invoke the Fifth Amendment in declining to produce the documents; the privilege does not extend to such artificial entities. See *Braswell* v. *United States, ante,* at 102–103; *Bellis* v. *United States,* 417 U. S. 85, 89–90 (1974). Similarly, petitioner asserts no Fifth Amendment right to prevent the banks from disclosing the account records, for the Constitution "necessarily does not proscribe incriminating statements elicited from an-

---

[4] The Second and Eleventh Circuits, as did the Fifth, have held that the Fifth Amendment is not implicated by a court order compelling consent to the disclosure of foreign bank records. *United States* v. *Ghidoni,* 732 F. 2d 814 (CA11), cert. denied, 469 U. S. 932 (1984); *United States* v. *Davis,* 767 F. 2d 1025, 1039–1040 (CA2 1985); accord, *In re Grand Jury Subpoena,* 826 F. 2d 1166 (CA2 1987), cert. pending *sub nom. Coe* v. *United States,* No. 87–517. A divided panel of the First Circuit, however, has held that such an order violates the Fifth Amendment. *In re Grand Jury Proceedings (Ranauro),* 814 F. 2d 791 (1987).

other." *Couch* v. *United States,* 409 U. S. 322, 328 (1973). Petitioner's sole claim is that his execution of the consent forms directing the banks to release records as to which the banks believe he has the right of withdrawal has independent testimonial significance that will incriminate him, and that the Fifth Amendment prohibits governmental compulsion of that act.

The Self-Incrimination Clause of the Fifth Amendment reads: "No person . . . shall be compelled in any criminal case to be a witness against himself." This Court has explained that "the privilege protects a person only against being incriminated by his own compelled testimonial communications." *Fisher* v. *United States,* 425 U. S., at 409, citing *Schmerber* v. *California,* 384 U. S. 757 (1966); *United States* v. *Wade,* 388 U. S. 218 (1967); and *Gilbert* v. *California,* 388 U. S. 263 (1967). The execution of the consent directive at issue in this case obviously would be compelled, and we may assume that its execution would have an incriminating effect.[5] The question on which this case turns is whether the act of executing the form is a "testimonial communication." The parties disagree about both the meaning of "testimonial" and whether the consent directive fits the proposed definitions.

### A

Petitioner contends that a compelled statement is testimonial if the Government could use the content of the speech or writing, as opposed to its physical characteristics, to further a criminal investigation of the witness. The second half of petitioner's "testimonial" test is that the statement must be incriminating, which is, of course, already a separate re-

---

[5] As noted above, the District Court concluded that the consent directive was incriminating in that it would furnish the Government with a link in the chain of evidence leading to Doe's indictment. Because we ultimately find no testimonial significance in either the contents of the directive or Doe's execution of it, we need not, and do not, address the incrimination element of the privilege.

quirement for invoking the privilege. Thus, Doe contends, in essence, that every written and oral statement significant for its content is necessarily testimonial for purposes of the Fifth Amendment.[6] Under this view, the consent directive is testimonial because it is a declarative statement of consent made by Doe to the foreign banks, a statement that the Government will use to persuade the banks to produce potentially incriminating account records that would otherwise be unavailable to the grand jury.

The Government, on the other hand, suggests that a compelled statement is not testimonial for purposes of the privilege, unless it implicitly or explicitly relates a factual assertion or otherwise conveys information to the Government. It argues that, under this view, the consent directive is not

---

[6] Petitioner's blanket assertion that a statement is testimonial for Fifth Amendment purposes if its content can be used to obtain evidence confuses the requirement that the compelled communication be "testimonial" with the separate requirement that the communication be "incriminating." If a compelled statement is "not testimonial and for that reason not protected by the privilege, it cannot become so because it will lead to incriminating evidence." *In re Grand Jury Subpoena*, 826 F. 2d, at 1172, n. 2 (concurring opinion).

Petitioner's heavy reliance on this Court's decision in *Kastigar* v. *United States*, 406 U. S. 441 (1972), for a contrary proposition is misguided. *Kastigar* affirmed the constitutionality of 18 U. S. C. §§ 6002 and 6003, which permit the Government to compel testimony as long as the witness is immunized against the use in any criminal case of the "testimony or other information" provided. In holding that the immunity provided by the statute is coextensive with the Fifth Amendment privilege, the Court implicitly concluded that the privilege prohibits "the use of compelled testimony, as well as evidence derived directly and indirectly therefrom." 406 U. S., at 453. The prohibition of derivative use is an implementation of the "link in the chain of evidence" theory for invocation of the privilege, pursuant to which the "compelled testimony" need not itself be incriminating if it would lead to the discovery of incriminating evidence. See *Hoffman* v. *United States*, 341 U. S. 479, 486 (1951). See also *Murphy* v. *Waterfront Comm'n of New York Harbor*, 378 U. S. 52, 79 (1964); 8 J. Wigmore, Evidence § 2260 (McNaughton rev. 1961) (Wigmore). This prohibition, however, assumes that the suspect's initial compelled communication is testimonial.

testimonial because neither the directive itself nor Doe's execution of the form discloses or communicates facts or information. Petitioner disagrees.

The Government's view of the privilege, apparently accepted by the Courts of Appeals that have considered compelled consent forms,[7] is derived largely from this Court's decisions in *Fisher* and *Doe*. The issue presented in those cases was whether the act of producing subpoenaed documents, not itself the making of a statement, might nonetheless have some protected testimonial aspects. The Court concluded that the act of production could constitute protected testimonial communication because it might entail implicit statements of fact: by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic. *United States* v. *Doe*, 465 U. S., at 613, and n. 11; *Fisher*, 425 U. S., at 409–410; *id.*, at 428, 432 (concurring opinions). See *Braswell* v. *United States, ante,* at 104; *ante,* at 122 (dissenting opinion). Thus, the Court made clear that the Fifth Amendment privilege against self-incrimination applies to acts that imply assertions of fact.

We reject petitioner's argument that this test does not control the determination as to when the privilege applies to oral or written statements. While the Court in *Fisher* and *Doe* did not purport to announce a universal test for determining the scope of the privilege, it also did not purport to establish a more narrow boundary applicable to acts alone. To the contrary, the Court applied basic Fifth Amendment principles.[8] An examination of the Court's application of these

---

[7] See *In re United States Grand Jury Proceedings (Cid)*, 767 F. 2d 1131, 1132 (CA5 1985); *In re Grand Jury Proceedings (Ranauro)*, 814 F. 2d, at 793; *id.*, at 798 (dissenting opinion); *United States* v. *Davis*, 767 F. 2d, at 1040. See also *United States* v. *Ghidoni*, 732 F. 2d, at 816.

[8] The decisions in *Fisher* v. *United States*, 425 U. S. 391 (1976), and *United States* v. *Doe*, 465 U. S. 605 (1984), rested on the understanding that "'the Court has never on any ground . . . applied the Fifth Amend-

principles in other cases indicates the Court's recognition that, in order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information.[9] Only then is a person compelled to be a "witness" against himself.

This understanding is perhaps most clearly revealed in those cases in which the Court has held that certain acts, though incriminating, are not within the privilege. Thus, a suspect may be compelled to furnish a blood sample, *Schmerber* v. *California*, 384 U. S., at 765; to provide a handwriting exemplar, *Gilbert* v. *California*, 388 U. S., at 266–267, or a voice exemplar, *United States* v. *Dionisio*, 410 U. S. 1, 7 (1973); to stand in a lineup, *United States* v. *Wade*, 388 U. S., at 221–222; and to wear particular clothing, *Holt* v. *United States*, 218 U. S. 245, 252–253 (1910). These decisions are grounded on the proposition that "the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Schmerber*, 384 U. S., at 761. The Court accordingly held that the privilege

---

ment to prevent the otherwise proper acquisition or use of evidence which, in the Court's view, did not involve compelled testimonial self-incrimination of some sort.'" *Id.*, at 611, n. 8, quoting *Fisher*, 425 U. S., at 399. The Court thus squarely held that the Fifth Amendment comes into play "only when the accused is compelled to make a *testimonial* communication that is incriminating." *Id.*, at 408 (emphasis in original); see *id.*, at 409; *Doe*, 465 U. S., at 611, 613. These principles were articulated in general terms, not as confined to acts. Petitioner has articulated no cogent argument as to why the "testimonial" requirement should have one meaning in the context of acts, and another meaning in the context of verbal statements.

 [9] We do not disagree with the dissent that "[t]he expression of the contents of an individual's mind" is testimonial communication for purposes of the Fifth Amendment. *Post*, at 220, n. 1. We simply disagree with the dissent's conclusion that the execution of the consent directive at issue here forced petitioner to express the contents of his mind. In our view, such compulsion is more like "be[ing] forced to surrender a key to a strongbox containing incriminating documents" than it is like "be[ing] compelled to reveal the combination to [petitioner's] wall safe." *Post*, at 219.

was not implicated in each of those cases, because the suspect was not required "to disclose any knowledge he might have," or "to speak his guilt," *Wade*, 388 U. S., at 222–223. See *Dionisio*, 410 U. S., at 7; *Gilbert*, 388 U. S., at 266–267. It is the "extortion of information from the accused," *Couch* v. *United States*, 409 U. S., at 328, the attempt to force him "to disclose the contents of his own mind," *Curcio* v. *United States*, 354 U. S. 118, 128 (1957), that implicates the Self-Incrimination Clause. See also *Kastigar* v. *United States*, 406 U. S. 441, 445 (1972) (the privilege "protects against any *disclosures* that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used") (emphasis added). "Unless some attempt is made to secure a communication—written, oral or otherwise—upon which reliance is to be placed as involving [the accused's] consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one." 8 Wigmore § 2265, p. 386.[10]

---

[10] Petitioner's reliance on a statement in this Court's decision in *Schmerber* v. *California*, 384 U. S. 757 (1966), for the proposition that all verbal statements sought for their content are testimonial is misplaced. In *Schmerber*, the Court stated that the privilege extends to "an accused's communications, whatever form they might take," *id.*, at 763–764, but it did so in the context of clarifying that the privilege may apply not only to verbal communications, as was once thought, but also to physical communications. See *United States* v. *Wade*, 388 U. S. 218, 223 (1967). Contrary to petitioner's urging, the *Schmerber* line of cases does not draw a distinction between unprotected evidence sought for its physical characteristics and protected evidence sought for its content. Rather, the Court distinguished between the suspect's being compelled himself to serve as evidence and the suspect's being compelled to disclose or communicate information or facts that might serve as or lead to incriminating evidence. See, *e. g.*, *Schmerber*, 384 U. S., at 764. See also *Holt* v. *United States*, 218 U. S. 245, 252–253 (1910); 8 Wigmore § 2265, p. 386. In order to be privileged, it is not enough that the compelled communication is sought for its content. The content itself must have testimonial significance. *Fisher*, 425 U. S., at 408; *Gilbert* v. *California*, 388 U. S. 263, 267 (1967); *Wade*, 388 U. S., at 222.

It is consistent with the history of and the policies underlying the Self-Incrimination Clause to hold that the privilege may be asserted only to resist compelled explicit or implicit disclosures of incriminating information. Historically, the privilege was intended to prevent the use of legal compulsion to extract from the accused a sworn communication of facts which would incriminate him. Such was the process of the ecclesiastical courts and the Star Chamber—the inquisitorial method of putting the accused upon his oath and compelling him to answer questions designed to uncover uncharged offenses, without evidence from another source. See *Andresen* v. *Maryland*, 427 U. S. 463, 470–471 (1976); 8 Wigmore § 2250; E. Griswold, The Fifth Amendment Today 2–3 (1955). The major thrust of the policies undergirding the privilege is to prevent such compulsion. The Self-Incrimination Clause reflects "'a judgment . . . that the prosecution should [not] be free to build up a criminal case, in whole or in part, with the assistance of enforced *disclosures* by the accused'" (emphasis added). *Ullmann* v. *United States*, 350 U. S. 422, 427 (1956), quoting *Maffie* v. *United States*, 209 F. 2d 225, 227 (CA1 1954). The Court in *Murphy* v. *Waterfront Comm'n of New York Harbor*, 378 U. S. 52 (1964), explained that the privilege is founded on

> "our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,' . . . ; our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life,'

. . . ; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.'" *Id.*, at 55 (citations omitted).

These policies are served when the privilege is asserted to spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government.[11]

We are not persuaded by petitioner's arguments that our articulation of the privilege fundamentally alters the power of the Government to compel an accused to assist in his prosecution. There are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts. The vast majority of verbal statements thus will be testimonial and, to that extent at least, will fall within

---

[11] Petitioner argues that at least some of these policies would be undermined unless the Government is required to obtain evidence against an accused from sources other than his compelled statements, whether or not the statements make a factual assertion or convey information. Petitioner accordingly maintains that the policy of striking an appropriate balance between the power of the Government and the sovereignty of the individual precludes the Government from compelling an individual to utter or write words that lead to incriminating evidence. Even if some of the policies underlying the privilege might support petitioner's interpretation of the privilege, "it is clear that the scope of the privilege does not coincide with the complex of values it helps to protect. Despite the impact upon the inviolability of the human personality, and upon our belief in an adversary system of criminal justice in which the Government must produce the evidence against an accused through its own independent labors, the prosecution is allowed to obtain and use . . . evidence which although compelled is generally speaking not 'testimonial,' *Schmerber* v. *California*, 384 U. S. 757, 761." *Grosso* v. *United States*, 390 U. S. 62, 72–73 (1968) (BRENNAN, J., concurring). See also *Schmerber*, 384 U. S., at 762–763. If the societal interests in privacy, fairness, and restraint of governmental power are not unconstitutionally offended by compelling the accused to have his body serve as evidence that leads to the development of highly incriminating testimony, as *Schmerber* and its progeny make clear, it is difficult to understand how compelling a suspect to make a nonfactual statement that facilitates the production of evidence by someone else offends the privilege.

the privilege.[12] Furthermore, it should be remembered that there are many restrictions on the government's prosecutorial practices in addition to the Self-Incrimination Clause. Indeed, there are other protections against governmental efforts to compel an unwilling suspect to cooperate in an investigation, including efforts to obtain information from him.[13] We are confident that these provisions, together with the Self-Incrimination Clause, will continue to prevent abusive investigative techniques.

## B

The difficult question whether a compelled communication is testimonial for purposes of applying the Fifth Amendment often depends on the facts and circumstances of the particu-

---

[12] In particular, we do not agree that our articulation cuts back on the Court's explanation in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), that "the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" *Id.*, at 460, quoting *Malloy* v. *Hogan*, 378 U. S. 1, 8 (1964). In *Miranda*, the Court addressed a suspect's Fifth Amendment privilege in the face of custodial interrogation by the government. Our test for when a communication is "testimonial" does not authorize law enforcement officials to make an unwilling suspect speak in this context. It is clear that the accused in a criminal case is exempt from giving answers altogether, for (at least on the prosecution's assumption) they will disclose incriminating information that the suspect harbors.

To the extent petitioner attempts to construe *Miranda* as establishing an absolute right against being compelled to speak, that understanding is refuted by the Court's decision in *United States* v. *Dionisio*, 410 U. S. 1 (1973), in which the Court held that a suspect may not invoke the privilege in refusing to speak for purposes of providing a voice exemplar.

[13] For example, the Fourth Amendment generally prevents the government from compelling a suspect to consent to a search of his home, cf. *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 248–249 (1973); the attorney-client privilege prevents the government from compelling a suspect to direct his attorney to disclose confidential communications, see generally *Upjohn Co.* v. *United States*, 449 U. S. 383, 389 (1981); 8 Wigmore § 2292; and the Due Process Clause imposes limitations on the government's ability to coerce individuals into participating in criminal prosecutions, see generally *Rochin* v. *California*, 342 U. S. 165, 174 (1952).

lar case. *Fisher*, 425 U. S., at 410. This case is no exception. We turn, then, to consider whether Doe's execution of the consent directive at issue here would have testimonial significance. We agree with the Court of Appeals that it would not, because neither the form, nor its execution, communicates any factual assertions, implicit or explicit, or conveys any information to the Government.

The consent directive itself is not "testimonial." It is carefully drafted not to make reference to a specific account, but only to speak in the hypothetical. Thus, the form does not acknowledge that an account in a foreign financial institution is in existence or that it is controlled by petitioner. Nor does the form indicate whether documents or any other information relating to petitioner are present at the foreign bank, assuming that such an account does exist. Cf. *United States* v. *Ghidoni*, 732 F. 2d, at 818; *In re Grand Jury Proceedings (Ranauro)*, 814 F. 2d 791, 793 (CA1 1987); *In re Grand Jury Subpoena*, 826 F. 2d 1166, 1170 (CA2 1987), cert. pending *sub nom. Coe* v. *United States*, No. 87–517; *In re United States Grand Jury Proceedings (Cid)*, 767 F. 2d, at 1132. The form does not even identify the relevant bank. Although the executed form allows the Government access to a potential source of evidence, the directive itself does not point the Government toward hidden accounts or otherwise provide information that will assist the prosecution in uncovering evidence. The Government must locate that evidence "'by the independent labor of its officers,'" *Estelle* v. *Smith*, 451 U. S. 454, 462 (1981), quoting *Culombe* v. *Connecticut*, 367 U. S. 568, 582 (1961) (opinion announcing the judgment). As in *Fisher*, the Government is not relying upon the "'truth-telling'" of Doe's directive to show the existence of, or his control over, foreign bank account records. See 425 U. S., at 411, quoting 8 Wigmore § 2264, p. 380.

Given the consent directive's phraseology, petitioner's compelled act of executing the form has no testimonial significance either. By signing the form, Doe makes no statement,

explicit or implicit, regarding the existence of a foreign bank account or his control over any such account. Nor would his execution of the form admit the authenticity of any records produced by the bank. Cf. *United States* v. *Ghidoni*, 732 F. 2d, at 818–819; *In re Grand Jury Subpoena*, 826 F. 2d, at 1170. Not only does the directive express no view on the issue, but because petitioner did not prepare the document, any statement by Doe to the effect that it is authentic would not establish that the records are genuine. Cf. *Fisher*, 425 U. S., at 413. Authentication evidence would have to be provided by bank officials.

Finally, we cannot agree with petitioner's contention that his execution of the directive admits or asserts Doe's consent. The form does not state that Doe "consents" to the release of bank records. Instead, it states that the directive "shall be construed as consent" with respect to Cayman Islands and Bermuda bank-secrecy laws. Because the directive explicitly indicates that it was signed pursuant to a court order, Doe's compelled execution of the form sheds no light on his actual intent or state of mind.[14] The form does "direct" the

---

[14] The consent directive at issue here differs from the form at issue in *Ranauro* which suggested that the witness, in fact, had consented: "I, [witness], consent to the production to the [District Court and Grand Jury] of any and all records related to any accounts held by, or banking transactions engaged in with, [bank X], which are in the name of, or on behalf of: [witness], if any such records exist." 814 F. 2d, at 796. Further, the *Ranauro* form, unlike the directive here, did not indicate that it was executed under court order. *Id.*, at 795. It is true that the First Circuit made clear that its conclusion that the *Ranauro* form was testimonial did not turn on these distinctions, *ibid.*, but we are not sanguine that the differences are irrelevant. Even if the Self-Incrimination Clause was not implicated, it might be argued that the compelled signing of such a "consent" form raises due process concerns. Cf. *In re Grand Jury Subpoena*, 826 F. 2d, at 1171 (finding no due process violation where directive clearly states that witness is signing under compulsion of court order); *United States* v. *Ghidoni*, 732 F. 2d, at 818, n. 7 (same). Neither issue, of course, is presented by this case, and we take no position on whether such compulsion in fact would violate Fifth Amendment or due process principles.

bank to disclose account information and release any records that "may" exist and for which Doe "may" be a relevant principal. But directing the recipient of a communication to do something is not an assertion of fact or, at least in this context, a disclosure of information. In its testimonial significance, the execution of such a directive is analogous to the production of a handwriting sample or voice exemplar: it is a nontestimonial act. In neither case is the suspect's action compelled to obtain "any knowledge he might have." *Wade,* 388 U. S., at 222.[15]

We read the directive as equivalent to a statement by Doe that, although he expresses no opinion about the existence

---

[15] Petitioner apparently maintains that the performance of every compelled act carries with it an implied assertion that the act has been performed by the person who was compelled, and therefore the performance of the act is subject to the privilege. In *Wade, Gilbert,* and *Dionisio,* the Court implicitly rejected this argument. It could be said in those cases that the suspect, by providing his handwriting or voice exemplar, implicitly "acknowledged" that the writing or voice sample was his. But as the holdings make clear, this kind of simple acknowledgment—that the suspect in fact performed the compelled act—is not "sufficiently testimonial for purposes of the privilege." *Fisher,* 425 U. S., at 411. Similarly, the acknowledgment that Doe directed the bank to disclose any records the bank thinks are Doe's—an acknowledgment implicit in Doe's placing his signature on the consent directive—is not sufficiently testimonial for purposes of the privilege.

The dissent apparently disagrees with us on this point, although the basis for its disagreement is unclear. See *post,* at 221–222, n. 2. Surely, the fact that the executed form creates "a new piece of evidence that may be used against petitioner" is not relevant to whether the execution has testimonial significance, for the same could be said about the voice and writing exemplars the Court found were not testimonial in nature. Similarly irrelevant to the issue presented here is the dissent's invocation of the First Circuit's hypothetical of how the Government might use the directive to link petitioner to whatever documents the banks produce. That hypothetical, as the First Circuit indicated, *Ranauro,* 814 F. 2d, at 793, goes only to showing that the directive may be *incriminating,* an issue not presented in this case. See n. 5, *supra.* It has no bearing on whether the compelled execution of the directive is *testimonial.*

of, or his control over, any such account, he is authorizing the bank to disclose information relating to accounts over which, in the bank's opinion, Doe can exercise the right of withdrawal. Cf. *Ghidoni*, 732 F. 2d, at 818, n. 8 (similarly interpreting a nearly identical consent directive). When forwarded to the bank along with a subpoena, the executed directive, if effective under local law,[16] will simply make it possible for the recipient bank to comply with the Government's request to produce such records. As a result, if the Government obtains bank records after Doe signs the directive, the only factual statement made by anyone will be the *bank's* implicit declaration, by its act of production in response to the subpoena, that *it* believes the accounts to be petitioner's. Cf. *Fisher*, 425 U. S., at 410, 412–413. The fact that the bank's customer has directed the disclosure of his records "would say nothing about the correctness of the bank's representations." Brief for United States 21–22. Indeed, the Second and Eleventh Circuits have concluded that consent directives virtually identical to the one here are inadmissible as an admission by the signator of either control or existence. *In re Grand Jury Subpoena*, 826 F. 2d, at 1171; *Ghidoni*, 732 F. 2d, at 818, and n. 9.

---

[16] The Government of the Cayman Islands maintains that a compelled consent, such as the one at issue in this case, is not sufficient to authorize the release of confidential financial records protected by Cayman law. Brief for Government of Cayman Islands as *Amicus Curiae* 9–11. The Grand Court of the Cayman Islands has held expressly that a consent directive signed pursuant to an order of a United States court and at the risk of contempt sanctions, could not constitute "consent" under the Cayman confidentiality law. See *In re ABC Ltd.*, 1984 C. I. L. R. 130 (1984) (reviewing the consent directive at issue in *Ghidoni*). The United States observes that the cited decision has not been appealed and argues accordingly that Cayman law on the point has not been definitely settled.

The effectiveness of the directive under foreign law has no bearing on the constitutional issue in this case. Nevertheless, we are not unaware of the international comity questions implicated by the Government's attempts to overcome protections afforded by the laws of another nation. We are not called upon to address those questions here.

## III

Because the consent directive is not testimonial in nature, we conclude that the District Court's order compelling petitioner to sign the directive does not violate his Fifth Amendment privilege against self-incrimination. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

A defendant can be compelled to produce material evidence that is incriminating. Fingerprints, blood samples, voice exemplars, handwriting specimens, or other items of physical evidence may be extracted from a defendant against his will. But can he be compelled to use his mind to assist the prosecution in convicting him of a crime? I think not. He may in some cases be forced to surrender a key to a strongbox containing incriminating documents, but I do not believe he can be compelled to reveal the combination to his wall safe—by word or deed.

The document the Government seeks to extract from John Doe purports to order third parties to take action that will lead to the discovery of incriminating evidence. The directive itself may not betray any knowledge petitioner may have about the circumstances of the offenses being investigated by the grand jury, but it nevertheless purports to evidence a reasoned decision by Doe to authorize action by others. The forced execution of this document differs from the forced production of physical evidence just as human beings differ from other animals.[1]

---

[1] The forced production of physical evidence, which we have condoned, see *Gilbert* v. *California,* 388 U. S. 263 (1967) (handwriting exemplar); *United States* v. *Wade,* 388 U. S. 218 (1967) (voice exemplar); *Schmerber* v. *California,* 384 U. S. 757 (1966) (blood test); *Holt* v. *United States,* 218 U. S. 245 (1910) (lineup), involves no intrusion upon the contents of the mind of the accused. See *Schmerber,* 384 U. S., at 765 (forced blood test permissible because it does not involve "even a shadow of testimonial compulsion upon or enforced communication by the accused"). The forced

If John Doe can be compelled to use his mind to assist the Government in developing its case, I think he will be forced "to be a witness against himself." The fundamental purpose of the Fifth Amendment was to mark the line between the kind of inquisition conducted by the Star Chamber and what we proudly describe as our accusatorial system of justice. It

---

execution of a document that purports to convey the signer's authority, however, does invade the dignity of the human mind; it purports to communicate a deliberate command. The intrusion on the dignity of the individual is not diminished by the fact that the document does not reflect the true state of the signer's mind. Indeed, that the assertions petitioner is forced to utter by executing the document are false, causes an even greater violation of human dignity. For the same reason a person cannot be forced to sign a document purporting to authorize the entry of judgment against himself, cf. *Brady* v. *United States*, 397 U. S. 742, 748 (1970), I do not believe he can be forced to sign a document purporting to authorize the disclosure of incriminating evidence. In both cases the accused is being compelled "to be a witness against himself"; indeed, here he is being compelled to bear false witness against himself.

The expression of the contents of an individual's mind falls squarely within the protection of the Fifth Amendment. *Boyd* v. *United States*, 116 U. S. 616, 633–635 (1886); *Fisher* v. *United States*, 425 U. S. 391, 420 (1976). Justice Holmes' observation that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him," *Holt* v. *United States*, 218 U. S., at 252–253, manifests a recognition that virtually any communication reveals the contents of the mind of the speaker. Thus the Fifth Amendment privilege is fulfilled only when the person is guaranteed the right " 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' " *Miranda* v. *Arizona*, 384 U. S. 436, 460 (1966) (quoting *Malloy* v. *Hogan*, 378 U. S. 1, 8 (1964)). The deviation from this principle can only lead to mischievous abuse of the dignity the Fifth Amendment commands the Government afford its citizens. Cf. *Schmerber* v. *California*, 384 U. S., at 764. The instant case is illustrative. In allowing the Government to compel petitioner to execute the directive, the Court permits the Government to compel petitioner to speak against his will in answer to the question "Do you consent to the release of these documents?" Beyond this affront, however, the Government is being permitted also to demand that the answer be "yes."

reflects "our respect for the inviolability of the human personality," *Murphy* v. *Waterfront Comm'n of New York Harbor*, 378 U. S. 52, 55 (1964). "[I]t is an explicit right of a natural person, protecting the realm of human thought and expression." *Braswell* v. *United States*, *ante*, at 119 (KENNEDY, J., dissenting). In my opinion that protection gives John Doe the right to refuse to sign the directive authorizing access to the records of any bank account that he may control.[2] Accordingly, I respectfully dissent.

---

[2] The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a *witness* against himself." A witness is one who "gives evidence in a cause." T. Cunningham, 2 New and Complete Law Dictionary (2d ed. 1771). The Court carefully scrutinizes the particular directive at issue here to determine whether its "form" or "execution" "communicates any factual assertions, implicit or explicit, or conveys any information to the Government." *Ante*, at 215. But the Court's opinion errs in focusing only on whether the directive reveals historical facts, ignoring that the execution of the directive *creates new* facts and a new piece of evidence that may be used against petitioner. The Court determines that the document's form has no testimonial significance because it does not reveal the identity of any particular banks or acknowledge the existence of any particular foreign accounts. This much is true. But the document does reveal exactly what it purports to reveal, which is that petitioner "directs," see *ante*, at 204–205, n. 2, the release of any documents that conform to the description contained in the statement. Thus, by executing the document, petitioner admits a state of mind, a present-tense desire. That the directive asserts that it was executed "pursuant to" court order does not save petitioner from this compelled admission. Only the most sophisticated bank officer could be expected to understand the phrase "pursuant to that certain order," *ibid.*, to mean "executed involuntarily under pain of contempt." But even if the directive expressly revealed its involuntary character, it would still communicate the direction that incriminating documents be produced.

By executing the document, petitioner creates evidence that has independent significance. The Court's opinion does not foreclose the possibility that the Government will attempt to introduce the directive itself to create a link between petitioner and whatever documents the Government is able to secure through use of the directive. This danger was fully described in an example employed by the First Circuit in its analysis of a

document, which, like the one at issue here, did not assert the existence of any particular bank records or accounts:

"Suppose that at trial the government were to introduce bank records produced in response to a subpoena that had been accompanied by the consent form and that it was not apparent from the face of the records or otherwise how [defendant] was linked to them. Suppose also that the government then introduced the subpoena and consent form, and a government witness testified that the bank records were received in response to the subpoena and consent form. . . . Would not the evidence linking [defendant] to the records be his own testimonial admission of consent?" *In re Grand Jury Proceedings (Ranauro)*, 814 F. 2d 791, 793 (1987).

The example reveals that the compelled execution causes the creation of evidence that did not exist before and which through the Government's artifice may become part of the prosecution's case against petitioner. The example also demonstrates that the "testimonial" significance of the directive can only be appreciated if the document is considered in its completed form from the perspective of an individual who knows no more about the circumstances of its creation than is revealed on its face. The fact that the document was produced under compulsion, which the Court relies on in asserting that the directive "sheds no light on [petitioner's] actual intent or state of mind," *ante*, at 216, is not relevant to consideration of the document's testimonial significance.

A critical issue at any trial at which the Government seeks to introduce bank records produced by a compulsory directive would be proof that the documents pertain to accounts within the control of the defendant. The directive relates the testimonial fact that the defendant ordered the production of those documents which relate to any account he has at a bank or trust company or over which he has signatory authority. Perhaps this testimony alone does not prove the fact of control, but it is certainly probative of that fact. The defendant can no longer testify without contradiction from the face of the directive that he never authorized the production of records relating to his accounts. The directive that he was compelled to create testifies against him.