# IN THE SUPREME COURT OF IOWA

No. 21–0657

Submitted September 15, 2022—Filed February 3, 2023

**STATE OF IOWA,**

Appellee,

vs.

**DEONTE WB ELLISON,**

Appellant.

---

Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

A defendant appeals his conviction for voluntary manslaughter, arguing that the district court committed reversible error in instructing the jury. **AFFIRMED.**

McDermott, J., delivered the opinion of the court in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Darrel Mullins (argued), Assistant Attorney General, for appellee.

**McDERMOTT, Justice.**

The State charged Deonte Ellison with first-degree murder after he shot and killed Curtis Smothers in the midst of a fistfight they were having on a city street in Dubuque. At trial, Ellison argued that he was justified in shooting Smothers to put a stop to Smothers's ongoing attack. The jury ultimately acquitted Ellison of the murder charge but found him guilty of the lesser included offense of voluntary manslaughter.

Ellison argues in this appeal that the district court erroneously instructed the jury on a "stand your ground" defense. Because he never actually raised a stand-your-ground defense in the case, Ellison argues that the instruction confused the jury about his *actual* justification defense. Ellison also argues that another jury instruction—one that prevents a justification defense if the jury finds that the defendant concealed or disguised physical evidence—in effect compelled him to reveal evidence in violation of his constitutional right against self-incrimination.

### I. Facts and Procedural History.

The altercation between Ellison and Smothers was captured by a traffic camera on July 2, 2020. The camera was positioned on a traffic signal pole above a city street in Dubuque. The video, which was entered into evidence and played for the jury, shows a car (driven by Ellison) pulling into a parallel parking spot along the street around 6:00 p.m. A second car (driven by Ellison's wife, Vanessa Ellison) pulls into the spot behind Ellison's car soon after. Several children accompany Vanessa. The oldest of them, a daughter of about elementary school

age, was borne of a prior relationship between Vanessa and Curtis Smothers. Ellison and Vanessa have two younger children together.

About a minute after Ellison parks his car, a white SUV containing Smothers and two other men drives down the street, heading in the same direction as Ellison and his wife had been before they parked. Vanessa and her daughter had exited her car by this point, but Ellison remained in his car. The white vehicle drives past the parked cars, but as it approaches an intersection just past the cars, it pulls over too. One of the men in the vehicle testified that Smothers recognized his daughter on the sidewalk and asked the driver to pull over so he could get out and talk to her. After Smothers exits the vehicle, he moves quickly down the sidewalk toward his daughter and then lifts her in the air as they meet for an extended embrace.

A no-contact order, based on Smothers's prior physical abuse of Vanessa, prohibited Smothers from making any contact with Vanessa or her family. Vanessa testified that she'd not seen Smothers in perhaps a year before he appeared on the sidewalk. Ellison was aware of Smothers's past physical abuse of Vanessa.

Ellison, meanwhile, remains seated in the driver's seat of his car, talking to a man standing in the street who has appeared at his open car door. While Smothers and the daughter continue their embrace, Ellison's wife opens the passenger doors of her car, removing bags and a child in a car seat.

When Smothers ends his embrace with his daughter, he remains on the sidewalk and appears to give a fist-bump greeting to one of the other children.

Ellison, now out of his car, walks toward the sidewalk between his and Vanessa's parked cars. Witnesses testified that, at this point, Ellison and Smothers started what would quickly turn into a heated exchange of words. Smothers, still situated on the sidewalk, kicks off his sandals, appearing ready to fight. Ellison, now also on the sidewalk, pushes Smothers away. The jawing continues. About twelve seconds later, Ellison punches Smothers, Smothers punches back, and fists fly.

Over the next twenty seconds, Ellison and Smothers move around the sidewalk in a full-on fistfight. According to one of the men with Smothers, at some point during the fight, Ellison displayed (or even fired a warning shot from) a handgun he'd pulled from his waistband, prompting Smothers to ask Ellison, "Are you going to shoot me in front of my daughter?"

Smothers appears to pursue Ellison toward the street, with Ellison moving backwards into the space between the parallel-parked cars. Ellison stops and pushes Smothers away. Smothers responds with another punch. Ellison then draws a handgun from his waistband and fires. Smothers stumbles onto the sidewalk and collapses, motionless. Everyone present quickly scatters, with the exception of the two men who had arrived with Smothers in the white SUV. Ellison and several of the others run across the street into a nearby house. One of the men with Smothers calls 911 from his cell phone, and police officers arrive within about a minute.

Everything just described—from the moment Ellison parked his car to the moment police arrived—spanned less than five minutes. Smothers died of a single gunshot wound to the chest.

Several hours later, police executed a search warrant on the home across the street that Ellison went into after the shooting. In the intervening period, Ellison broke out a back window and left the area. Investigators pinged Ellison's cell phone, which lead to his apprehension on July 14 in Kalamazoo, Michigan (the city in which Ellison resided). At trial, the jury was informed that surveillance footage in Kalamazoo showed Ellison with a shaved head. The jury was also informed through the testimony of multiple witnesses that police never recovered the gun used in the shooting.

Ellison was charged with first-degree murder (a class "A" felony), Iowa Code § 707.2 (2020), and felon in possession of a firearm (a class "D" felony), *id.* § 724.26(1). He pleaded guilty to the felon-in-possession charge. After a trial, the jury rejected the State's first-degree murder charge and instead found Ellison guilty of the lesser included offense of voluntary manslaughter (a class "C" felony), *id.* § 707.4.

## II. Analysis of the Arguments.

### A. Did the district court err in giving an instruction on a stand-your-ground defense?

A person is justified in using "reasonable force" against another if "the person reasonably believes that such force is necessary to defend oneself or another from any actual or imminent use of unlawful force." Iowa Code § 704.3. "Reasonable force," in turn, is defined as "that force and no more which a

reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss." *Id.* § 704.1(1). Deadly force is reasonable if the person reasonably believes that deadly force "is necessary to avoid injury or risk to one's life or safety or the life or safety of another." *Id.*

The justification defense—the notion that one is justified and thus shouldn't be held criminally liable in using force in response to impending harm—comes with several important caveats. As relevant here, the use of force generally is *not* justified when the person knows that he can avoid the need to use it with complete safety by retreating or taking an alternate course. *See, e.g.*, *State v. Lorenzo Baltazar*, 935 N.W.2d 862, 870 (Iowa 2019). But in 2017, the legislature added a caveat to this caveat with a new subsection stating that "[a] person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force." 2017 Iowa Acts ch. 69, § 37 (codified at Iowa Code § 704.1(3) (2018)). The new subsection, providing what's colloquially referred to as the right to "stand your ground," modified the usual requirement that a person in the face of a threat must retreat if possible before resorting to force. The amended statute makes clear that people need *not* retreat from a place where they are lawfully present and not "engaged in illegal activity" before they resort to force. *State v. Williams*, 929 N.W.2d 621, 637 (Iowa 2019).

In light of the changes to the statute, the district court used a new jury instruction. This Jury Instruction (Instruction 29)—which Ellison objected to—stated:

> If any of the following is true, the defendant's use of force was not justified:
>
> 1. The defendant did not have a reasonable belief that it was necessary to use force to prevent an injury or loss.
>
> 2. The defendant used unreasonable force under the circumstances.
>
> 3. The defendant was engaged in illegal activity in the place where he used force, he made no effort to retreat, and retreat was a reasonable alternative to using force.
>
> If the State has proved any of these beyond a reasonable doubt, the defendant's use of force was not justified.

Subsection 3 of this instruction repackages the language in section 704.1(3) in its negative form, instructing that the jury could not find that Ellison was justified in using force if he was engaged in illegal activity and made no effort to make a retreat when reasonable. *See* Iowa Code § 704.1(3).

Ellison argues that this formulation confused the jury because it suggested that his justification defense involved a claim to "stand his ground" without retreating when in fact Ellison's justification defense involved no such claim. Ellison urges that the stand-your-ground defense isn't pertinent to *every* case in which a claim of justification arises and that the court's instruction, framed as it was, caused the jury to reject his defense merely because he couldn't establish the inapplicable elements of the stand-your-ground exception.

In *State v. Lorenzo Baltazar*, we observed that after the 2017 amendments, a person lawfully present and not engaged in illegal activity had no duty to retreat before using force. 935 N.W.2d at 870. But we went on to say that the new language *by implication* continued to impose a duty to retreat if a person *is* engaging in illegal activity or not lawfully present. *Id.* ("[T]he 2017 amendment changed—but did not eliminate—the implied duty to follow an alternative course of action."). The usual duty to retreat generally still exists if a person is engaged in illegal activity or has no right to be present. *Id.*

The defendant in *Lorenzo Baltazar* claimed on appeal that he was entitled to a stand-your-ground defense and argued that his lawyer provided ineffective assistance by failing to request an instruction that included it. *Id.* at 871. We held that since the defendant had been engaged in illegal activity at the time he used deadly force, he wasn't entitled to a stand-your-ground instruction, and we thus rejected his ineffective assistance argument. *Id.* Yet this case presents something of the inverse: Ellison claims to have raised no stand-your-ground defense and argues that the district court erred in giving an instruction that included it. As Ellison puts it, his "sole defense was that he acted with justification because Smothers was the aggressor."

In reviewing alleged error in jury instructions, we determine as an initial matter whether the instructions correctly state the law. *State v. Schuler*, 774 N.W.2d 294, 297 (Iowa 2009). Instruction 29 essentially restates, with minor modification, the language of Iowa Code section 704.1(3), so its inclusion, without more, contains no misstatement of the law. But even instructions that

correctly state the law may not be given if they aren't also "supported by substantial evidence." *State v. Liggins*, 557 N.W.2d 263, 267 (Iowa 1996). And this seems to be the thrust of Ellison's objection. "Requested instructions that are not related to the factual issues to be decided by the jury should not be submitted even though they may set out a correct statement of the law." *Vachon v. Broadlawns Med. Found.*, 490 N.W.2d 820, 822 (Iowa 1992).

The State argues that the instructions, including Instruction 29, appropriately set forth Iowa's justification law as applied to this case, which the State had to overcome to meet its burden. It's a settled point that when a defendant raises a justification defense, the State has the burden to prove beyond a reasonable doubt that the defendant's use of force was not justified. *State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006). A defendant, the State argues, can't unilaterally relieve the State of its burden through omission in the jury instructions.

The formulation of Instruction 29 reflects the chapped structure of the amended statutory text from which it derives. But its syntactical awkwardness notwithstanding, it correctly stated the law and, most relevant here, addressed factual issues that the jury needed to decide. The district court is under no requirement "to give any particular form of an instruction; rather, the court must merely give instructions that fairly state the law as applied to the facts of the case." *State v. Marin*, 788 N.W.2d 833, 838 (Iowa 2010), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699 (Iowa 2016).

Although Ellison claims not to have raised a stand-your-ground defense, he never conceded that he was engaged in "illegal activity" when he shot Smothers. Had the State failed to show that Ellison was engaged in illegal activity, Ellison would have had the right to "stand his ground" and would have had no duty to retreat. The State, in that situation, would have needed to prove one of the other propositions in the instruction (subsection 1 or 2, quoted above) to defeat Ellison's justification defense.

As a result, Ellison's argument that a stand-your-ground defense wasn't in play—and thus that the stand-your-ground instruction was erroneously given—must fail in this case. With the open question of whether Ellison was "engaged in illegal activity," a court's failure to provide a stand-your-ground instruction to the jury would have left unanswered whether the exception applied and, along with it, whether the State had met its burden to rebut each element of the justification defense. We thus reject Ellison's argument that the district court erred by including the stand-your-ground exception in the instructions.[1]

Our finding of no error in this instruction notwithstanding, the instructions would find improved clarity with a formulation that better reflects

---

[1]This does not mean that a defendant engaged in illegal conduct under Iowa Code section 704.1(3) is always denied the right to use force to defend himself in the face of an imminent threat of unlawful force. Engaging in illegal activity does not, on its own, leave a person defenseless to respond to unlawful force. The legislature in section 704.6 lays out the limited circumstances in which a person will have no justification defense to an aggressor. *See* Iowa Code § 704.6 (including, for instance, participating in a forcible felony or riot, provoking someone to use force to trigger one's own use of force in response, or provoking someone to use force by one's own unlawful acts and then responding with force). Section 704.1(3) provides that people engaging in unspecified illegal activity simply may not "stand their ground" and use force in response to a threat if a reasonable opportunity to retreat existed. *See Lorenzo Baltazar*, 935 N.W.2d at 870.

that the duty to retreat remains an *exception* to the justification defense and that the stand-your-ground defense is an *exception* to the duty to retreat. *See, e.g.*, Model Penal Code § 3.04 (Am. L. Inst. 1985). A clearer formulation might help jurors grasp that "stand your ground" is best understood as an exception to an exception in a justification defense.

**B. Did including the term "illegal activity" in the instructions violate Ellison's due process rights?**

Instruction 29 required the jury to determine whether Ellison was engaged in "illegal activity" when he shot Smothers. Instruction 29 was followed by a related instruction—Instruction 29A—that offered the jury a particular crime that it might find to establish the illegal activity. Instruction 29A reads:

> With regard to element no. 3 of the previous two instructions, it is illegal for a person to go armed with any dangerous weapon with the intent to use that weapon against another person without justification. The defendant is not charged with this crime.

The term "illegal activity" comes straight from the section 704.1(3). Iowa Code § 704.1(3) ("A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force."). Ellison argues the term as applied to him under these jury instructions is unconstitutionally vague.

Both the Fourteenth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution forbid the taking of someone's life, liberty, or property without due process of law. *State v. Newton*, 929 N.W.2d 250, 255 (Iowa 2019). These due process guarantees are violated when, as alleged here, a conviction arises out of "a criminal law so vague that it fails to give

ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

Ellison doesn't suggest any difference in construction between the two different constitutional due process guarantees. While we reserve the right to apply even identically-worded provisions of the Federal and Iowa Constitutions differently, Ellison hasn't offered any argument that would counsel us to treat them differently in this case, so we will apply the substantive federal due process standard as we've done in other cases. *See, e.g., Nguyen v. State*, 878 N.W.2d 744, 755 (Iowa 2016).

Ellison makes an "as applied" challenge to the statute, meaning that, although there might be lawful applications of the statute to other people in other circumstances, the law is unconstitutional as to him because of his particular circumstances. *See Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 764 (Iowa 2019). Ellison argues that the conduct used to establish the "illegal activity" referred to in Instruction 29—going armed with intent to use a firearm without justification—was "too intertwined" with the actions giving rise to the actual murder charge, and that whatever might be offered to show illegal activity "must be a wholly separate crime from the murder." Permitting the jury to use a crime with such a close connection to the actual murder charge, Ellison argues, gave the term "illegal activity" too broad an application in violation of his due process rights.

Ellison's argument strikes from the exact opposite direction as the one made by the defendant in *Lorenzo Baltazar*, 936 N.W.2d 862. In that case, the defendant argued that "illegal activity" must be *germane* to the person's use of force—not wholly separate from it. *Id.* at 871. The defendant argued that his possession of a handgun—the illegal activity recited to negate his claim to the stand-your-ground exception—was irrelevant to his duty to retreat. *Id.* But we determined that "[e]ven assuming the implied duty to retreat involves only illegal activities germane to the use of force, Baltazar's possession of the handgun was directly related to the shooting death." *Id.* We thus held that Baltazar had engaged in an illegal activity under section 704.1(3), and that it disqualified him from the stand-your-ground exception. *Id.*

How connected, or disconnected, must the "illegal activity" be to the homicide charge? We don't need to decide all the contours or permutations of that question in this case. Ellison brings his claim that the "illegal activity" is too connected in the form of an as-applied challenge. So we only need to answer whether the crime of going armed with intent (from Instruction 29A) is insufficiently separate to constitute the "illegal activity" in this case. Going armed with intent requires possession of a dangerous weapon with specific intent to use it against another person and movement from one place to another. *See* Iowa Code § 708.8; *State v. Harris*, 891 N.W.2d 182, 186 (Iowa 2017); *State v. Pearson*, 804 N.W.2d 260, 265 n.1 (Iowa 2011) (collecting cases). The jury could consider this potential form of "illegal activity" to negate a stand-your-ground defense. As applied to the facts of Ellison's case, we do not find that Instruction 29A's

instruction on the going-armed-with-intent crime creates an unconstitutionally vague application of "illegal activity."

Although we reject Ellison's vagueness challenge to the term "illegal activity," we believe that the instructions could have been more clearly stated by not including the term "illegal activity" at all. The court instead might simply have offered the elements of the State's proposed illegal activity, tying that finding directly to the viability of the stand-your-ground exception, without leaving the jury to supply its own definition of "illegal activity" and to consider whether the conduct met this definition.

**C. Did the district court's instruction that the jury consider whether Ellison fulfilled "a duty not to intentionally destroy, alter, conceal, or disguise" evidence violate Ellison's constitutional right against self-incrimination?**

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The Amendment's protection against compulsory self-incrimination applies to the states under the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 2–6 (1964). The Iowa Constitution doesn't contain language that directly tracks the Fifth Amendment's language. *See State v. Gibbs*, 941 N.W.2d 888, 894 (Iowa 2020). Still, we've held that the due process clause in article I, section 9 of the Iowa Constitution provides a corresponding protection against compulsory self-incrimination. *Id.*; *State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 518 n.2 (Iowa 2011). But much like his due process claim, Ellison doesn't suggest any difference in construction between the two different constitutional guarantees and doesn't offer any argument suggesting that we analyze them

differently in this case. We thus will analyze this issue under the Fifth Amendment. *See, e.g., Nguyen*, 878 N.W.2d at 755.

The handgun Ellison used to shoot Smothers was never recovered and thus never presented as evidence at trial. Instruction 32 informed the jury about the duty associated with the disposition of physical evidence when a person uses deadly force. It stated:

> After using deadly force, the defendant had the duty to not intentionally destroy, alter, conceal, or disguise physical evidence relating to the defendant's use of deadly force. You may consider whether the defendant complied with this duty when you decide whether deadly force was justified.

This instruction echoed the statutory language of section 704.2B(2), which states:

> The person using deadly force shall not intentionally destroy, alter, conceal, or disguise physical evidence relating to the person's use of deadly force, and the person shall not intentionally intimidate witnesses into refusing to cooperate with any investigation relating to the use of such deadly force or induce another person to alter testimony about the use of such deadly force.

Iowa Code § 704.2B(2).

Ellison argues that Instruction 32 violated his right against self-incrimination under both the Federal and Iowa Constitutions by requiring a "testimonial" act and thus penalizing his silence. In *State v. Gibbs*, we addressed an as-applied challenge involving another subsection of this statute, section 704.2B(1), to determine whether a jury instruction restating its statutory language improperly penalized silence. 941 N.W.2d at 897. Subsection 1 states:

> If a person uses deadly force, the person shall notify or cause another to notify a law enforcement agency about the person's use of deadly force within a reasonable time period after the person's use

of the deadly force, if the person or another person is capable of providing such notification.

*Id.* § 704.2B(1). We held that the jury instruction paraphrasing subsection 1 improperly penalized the defendant's exercise of the constitutional right to remain silent by "authorizing an inference of guilt in a murder case because the defendant breached a legal duty to make a report to authorities." *Gibbs*, 941 N.W.2d at 897.

Subsection 1 includes language that imposes a duty to communicate— "the person shall notify or cause another to notify a law enforcement agency"— that doesn't similarly appear in subsection 2. *Compare* Iowa Code § 704.2B(1), *with id.* § 704.2B(2). We held that this duty to communicate, as incorporated into the jury instructions in *Gibbs*, imposed an unconstitutional penalty against the defendant "for failing to affirmatively seek out the authorities and speak to them prearrest—with no Fifth Amendment exception." *Gibbs*, 941 N.W.2d at 898.

In reaching our holding in *Gibbs*, we did not consider—and did not decide—whether the separate duties about the treatment of physical evidence in section 704.2B(2) violated constitutional protections. *Id.* at 897 n.2. The State argues that, in this case, the duty from subsection 2 incorporated into Instruction 32 to "not intentionally destroy, alter, conceal, or disguise physical evidence" does not compel any communication by the defendant that could be considered "testimonial" in nature but instead imposes duties only on mere *conduct* relating to physical evidence. Since the required evidence-preserving conduct doesn't constitute testimonial communication, argues the State, no Fifth Amendment problem exists.

None of the verbs at issue—"destroy, alter, conceal, or disguise"—were defined in the jury instructions. (Nor are they defined anywhere in Iowa Code chapter 704.) But words used in a jury instruction "need not be defined if they are of ordinary usage and are generally understood." *State v. Weiss*, 528 N.W.2d 519, 520 (Iowa 1995) (per curiam). None of the words listed in Instruction 32 strike us as beyond the lexicon of a reasonable juror.

Ellison suggests that a person reasonably might conclude that a "duty not to intentionally destroy, alter, conceal or disguise" implies some affirmative duty *to reveal* or *to disclose* incriminating evidence. He urges that requiring a person to disclose evidence of their own involvement in a potential criminal act to law enforcement risks loss of the justification defense itself, if the person fails to disclose evidence. But this dilemma raises Fifth Amendment concerns nearly identical to those we uncovered in *Gibbs*, 941 N.W.2d at 898.

The State argues that "the right to silence does not apply to physical evidence," and in support of this assertion, it cites a number of cases that require the defendant to produce, for instance, blood samples, handwriting exemplars, voice exemplars, tax documents, and other types of business documents. *See State v. Decker*, 744 N.W.2d 346, 355 (Iowa 2008) (providing a similar list of "nontestimonial evidence"). But this argument doesn't address testimonial features that often accompany a person's disclosure of physical evidence. The Fifth Amendment's protections extend not only to government coercion of direct testimony but also to penalties the government imposes against the accused that

have the *effect* of depriving people of the right to remain silent. *Gibbs*, 941 N.W.2d at 894).

In *Doe v. United States*, the United States Supreme Court explained how it has historically interpreted the privilege against testimonial communications where a defendant is required to produce incriminating documents. 487 U.S. 201, 208–09 (1988) (citing *United States v. Doe*, 465 U.S. 605 (1984), and *Fisher v. United States*, 425 U.S. 391 (1976)). The Court reiterated that the act of producing evidence to the government "could constitute protected testimonial communication because it might entail implicit statements of fact." *Id.*; *see also Decker*, 744 N.W.2d at 354. As to producing subpoenaed documents, for example, the act itself is "testimonial" since "the witness would admit that the papers existed, were in his possession or control, and were authentic." *Doe*, 487 U.S. at 208. The Supreme Court has "made clear that the Fifth Amendment privilege against self-incrimination applies to acts"—in other words, conduct— "that imply assertions of fact." *Id.*

But the "duty not to intentionally destroy, alter, conceal, or disguise physical evidence" does not imply, in our view, any assertion of fact necessary to trigger Fifth Amendment concerns. Applying the ordinary meanings of these words, the operative verbs impose no affirmative duty to disclose evidence to law enforcement or anyone else. And if there's no duty to disclose evidence—no communication required of the defendant to fulfill the duty—then there's no *testimonial* communication in violation of Ellison's Fifth Amendment privilege to run with it. As a result, we find that Ellison suffered no violation of his Fifth

Amendment rights, as applied to the states under the Fourteenth Amendment, when the district court gave a jury instruction paraphrasing section 704.2B(2).[2]

### III. Conclusion.

Finding no instructional error or constitutional violation, we affirm Ellison's conviction and sentence.

**AFFIRMED.**

---

[2]In *Gibbs*, we described concerns about a section 704.2B(1) instruction, 941 N.W.2d at 894–900, that might apply equally to subsection 2 in this case—in particular, the vague permission in Instruction 32 that the jury "may consider whether the defendant complied with this duty when you decide whether deadly force was justified." *How*, exactly, the jury should "consider" the failed duty is never explained. In *Gibbs*, we concluded that "there can only be one answer—so the jury holds it against the defendant in some significant but indeterminate way." *Id.* at 899. Yet whatever misgivings we might continue to harbor about these section 704.2B instructions, Ellison never raised—either in the district court or on appeal—any objection to the instruction on any basis other than Fifth Amendment grounds. We decline to take up different potential arguments about the instruction that were neither raised nor ruled on in the district court. *State v. Mitchell*, 757 N.W.2d 431, 435 (Iowa 2008).