UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 06-4008
(CR-04-564)

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES DANA SWEETS, a/k/a Sweets,

Defendant - Appellant.

O R D E R

The court amends its opinion filed July 3, 2007, as follows:

On page 1 in the first line under the "Counsel" section, the period in the name "G. Arthur Robbins" is deleted, and the "&" in "Chesapeake & Meridian" is deleted. On page 2 in the third line of the "Counsel" section, the "&" in "Chesapeake & Meridian" is deleted.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

JAMES DANA SWEETS, a/k/a Sweets,
          *Defendant-Appellant.*

No. 06-4008

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CR-04-564)

Argued: November 28, 2006

Decided: July 3, 2007

Before NIEMEYER and MICHAEL, Circuit Judges, and
Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in
which Judge Michael and Judge Goodwin concurred in part and con-
curred in the judgment. Judge Michael and Judge Goodwin each wrote
a separate opinion concurring in part and concurring in the judgment.

## COUNSEL

**ARGUED:** G Arthur Robbins, CHESAPEAKE MERIDIAN,
Annapolis, Maryland, for Appellant. Kwame Jangha Manley, Assis-

tant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James C. Howard, CHESAPEAKE MERIDIAN, Annapolis, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

## OPINION

NIEMEYER, Circuit Judge:

James Dana Sweets was convicted for his participation in an extensive drug trafficking conspiracy involving more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 846, and for his participation in a conspiracy to possess firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(n) (currently, 18 U.S.C.A. § 924(o) (West 2006)). The district court sentenced Sweets to 360 months' imprisonment. On appeal, Sweets contends principally that Baltimore City police and federal agents obtained evidence against him on two different occasions through violations of his Fifth Amendment rights and then used the evidence against him at trial.

First, he alleges that on May 17, 2004, Baltimore City police officers and federal agents coerced him into revealing the whereabouts of John Long, whom police were seeking in connection with a murder investigation. After Long was arrested, he pleaded guilty to drug trafficking charges and thereafter testified against Sweets pursuant to his plea agreement, implicating Sweets in the conspiracy for which he has now been convicted. Sweets contends that by coercing him to disclose Long's location, the police compelled Sweets to be a witness against himself.

Sweets also alleges that six months later, on November 18-19, 2004, after he had been arrested by Baltimore City police and federal agents on first-degree murder charges, he was questioned by police and gave a statement without having been advised of his *Miranda* rights; he was then questioned again on the same matters after having been given *Miranda* warnings. Sweets alleges that this method was an intentional strategy by police to legitimize his earlier unwarned statement.

We conclude that the May 17, 2004 coerced disclosure of Long's whereabouts did not violate Sweets' Fifth Amendment rights against self-incrimination because Sweets' disclosure of Long's location, even if testimonial in nature, was not incriminating. Moreover, the government did not introduce the fact of Sweets' production or any fruits of that fact at trial. With respect to the interrogation of Sweets on November 19, 2004, we conclude that the district court did not clearly err in finding as a fact that Sweets waived his *Miranda* rights.

Also rejecting Sweets' claim that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), we affirm.

I

Sweets participated in a drug trafficking conspiracy with John Long, Charles Garrison, and Maurice Green, which lasted approximately four years and involved the distribution of roughly four to nine ounces of crack cocaine per week. Sweets was a principal in the conspiracy, usually taking 50% of the conspiracy's profits. As part of the conspiracy, Sweets and Long kept a half-dozen firearms, including several handguns, a rifle, and a shotgun.

A jury convicted Sweets on one count of conspiracy involving at least 50 grams of crack cocaine and one count of conspiracy to possess firearms in furtherance of drug trafficking. The evidence introduced against Sweets included the testimony of Sweets' coconspirator, Long, photographs of the drugs and drug paraphernalia found in Long's hotel room when he was arrested, and Sweets' incriminating statement given to law enforcement officers on November 19, 2004. Sweets contends that the evidence was introduced against him in violation of his Fifth Amendment rights. The factual circumstances of obtaining the evidence were as follows.

A

As part of an investigation of John Long for first-degree murder, Baltimore City police officers and federal agents visited Sweets at his house in Baltimore City on May 17, 2004. Police officers knew that Sweets knew Long, and they went to Sweets' residence with the hope

of learning where Long, who was in hiding as the result of an earlier police raid, was presently located. Sweets' girlfriend admitted the police officers into the house, and after Sweets came out of the bathroom, the officers accompanied him to the living room to ask him questions about where Long was located. At first, Sweets denied knowing where Long was. But after the police told Sweets that they were going "to lock everybody [Sweets, Sweets' girlfriend, and her nephew] up for obstruction of justice if [Sweets] didn't take them where [Long] was at," Sweets agreed to take the officers to Long. After Sweets and the police drove to the hotel where Long was located and the officers verified that Long was actually there, they took Sweets back home. While Sweets and the officers were making the trip to the hotel, other officers remained with Sweets' girlfriend and her nephew, preventing Sweets' girlfriend from going to work and preventing anyone from making telephone calls.

At the hotel, the police arrested Long pursuant to a warrant and found drugs and drug paraphernalia in his hotel room. Long later pleaded guilty to drug charges and agreed to testify against Sweets about the pair's drug trafficking activities. The officers used the drugs and drug paraphernalia recovered from Long's hotel room as part of the evidence against Sweets.

B

Six months after visiting Sweets to discover Long's whereabouts, police officers again came to Sweets' house on November 18, 2004, now with a warrant for his arrest for first-degree murder, a charge not before us. Before formally arresting Sweets, the police officers handcuffed Sweets and asked him about the whereabouts of Maurice Green. After some questioning on that subject, Sweets agreed to take the police to Green, resulting in Green's arrest. Sweets was then taken to the police station where, at a little after 12:20 a.m., Detective Michael Glenn began questioning Sweets. Sweets gave Detective Glenn an incriminating statement, in which he admitted that Long had fronted him crack cocaine. At 1:40 a.m., Sweets agreed to repeat the incriminating statement on tape. The tape contains Sweets' receiving and acknowledging *Miranda* warnings.

The parties dispute when, during the course of these events, Sweets was *first* given *Miranda* warnings. Detective Glenn testified at the

suppression hearing before the district court that as soon as he entered the room, about 12:20 a.m., to question Sweets, he gave Sweets *Miranda* warnings, and Sweets, *at that time*, signed a form containing the warnings. The form noted that the time of the warnings was 12:24 a.m. Detective Glenn stated that he thereafter questioned Sweets and, after receiving an inculpating statement, brought in a tape recorder to record the statement. On tape, he again gave Sweets the *Miranda* warnings. Sweets, on the other hand, testified that Detective Glenn did not give him *Miranda* warnings when Detective Glenn entered the room at 12:20 a.m. Rather, Sweets stated that he gave an unwarned statement after which, at about 1:40 a.m., he was given the *Miranda* warnings that were heard on the tape recording. He also said that he signed the waiver form *after* giving the first statement, not at 12:25 a.m. as noted on the form.

The taped statement was introduced against Sweets at trial as part of the evidence against him.

Sweets filed a motion to suppress the testimony of John Long, the evidence of drugs and drug paraphernalia obtained from Long's hotel room on May 17, 2004, and Sweets' recorded statement taken on November 19, 2004. The district court denied the motions. The court concluded that the testimony of Long would not be suppressed, regardless of how his location became known. With respect to the November 19, 2004 incriminating statement, the court concluded that the first interrogation of Sweets at his house about the location of Green did not taint the statements given by Sweets at the police station and that the statements at the police station — both the untaped and taped versions — were given pursuant to a valid waiver of *Miranda* rights.

The jury convicted Sweets of both charged counts. Following sentencing by the district court, Sweets filed this appeal.

II

A

Sweets contends first that John Long's testimony, as well as the

drugs and paraphernalia found in Long's hotel room, should have been suppressed as the fruits of Sweets' coerced disclosure of Long's location at the hotel. His argument that he was coerced to give Long's location rests on (1) statements by police that they were going to lock up everyone in Sweets' house for obstruction of justice if Sweets did not take the police to Long; (2) the fact that Sweets did not "feel like [he] had a choice at that point" — the point when he was in the squad car on the way to John Long's location; and (3) the police restrictions on his girlfriend and her nephew, who were required to remain at Sweets' house and were prevented from making telephone calls. Thus Sweets argues that Long's testimony and the drugs and drug paraphernalia found in Long's hotel room were the fruits of his involuntary "statement" and should be suppressed as a violation of his Fifth Amendment rights. *See Chavez v. Martinez*, 538 U.S. 760, 769 (2003).[1]

The district court made no findings with respect to Sweets' claim that his disclosure of Long's location was coerced. For purposes of our analysis, therefore, we assume that Sweets was coerced into showing police where Long was located — leading to Long's arrest, to the recovery of drugs and drug paraphernalia in Long's hotel room, and ultimately to Long's testimony against Sweets. Under this assumption we must still address whether Sweets was "compelled . . . to be a witness against himself," within the meaning of the Fifth Amendment. U.S. Const., amend. V.

The Fifth Amendment right against self-incrimination "applies only when the accused is compelled [1] to make a testimonial communication [2] that is incriminating." *Fisher v. United States*, 425 U.S. 391, 408 (1976). A "testimonial communication" is usually a verbal or written statement, but it may also include an act. *See Doe v. United States*, 487 U.S. 201, 209 (1988) ("[T]he Fifth Amendment privilege against self-incrimination applies to acts"). Whether a statement or act, the testimonial communication "*must itself*, explicitly or implic-

---

[1]Sweets also contends that on this occasion, May 17, 2004, he was not given *Miranda* warnings, but appropriately he does not attempt to rely on the *Miranda* violation to suppress Long's testimony as the fruits of the violation. *See United States v. Patane*, 542 U.S. 630, 634 (2004); *Oregon v. Elstad*, 470 U.S. 298, 307 (1985); *Michigan v. Tucker*, 417 U.S. 433, 450-51 (1974).

itly, relate a factual assertion or disclose information" that incriminates. *Id.* at 210 (emphasis added). This requirement removes from the Fifth Amendment's protection a myriad of compelled acts that, while leading to the discovery of incriminating evidence, do not themselves make an incriminating factual assertion. *See, e.g., Pennsylvania v. Muniz*, 496 U.S. 582 (1990) (responding to a field sobriety test); *South Dakota v. Neville*, 459 U.S. 553 (1983) (taking a Breathalyzer test); *United States v. Wade*, 388 U.S. 218 (1967) (providing a voice exemplar); *Gilbert v. California*, 388 U.S. 263 (1967) (providing a handwriting exemplar); *Schmerber v. California*, 384 U.S. 757 (1966) (providing a blood sample); *Holt v. United States*, 218 U.S. 245 (1910) (donning a blouse worn by perpetrator). Thus, "compulsion which makes a suspect or accused the source of 'real or physical evidence' [generally] does not violate the Fifth Amendment." *Schmerber*, 384 U.S. at 764.

When a compulsory act does make an incriminating factual assertion, however, the privilege against self-incrimination may be implicated. For example, in cases involving the compelled production of documents where the issue "was whether the act of producing subpoenaed documents, not itself the making of a statement, might nonetheless have some protected testimonial aspects," *Doe*, 487 U.S. at 209, the Supreme Court made "clear that the . . . 'act of production' itself may implicitly communicate 'statements of fact'" that — if incriminating — would be privileged as testimonial acts. *United States v. Hubbell*, 530 U.S. 27, 36 (2000); *see also Chavez v. Martinez*, 538 U.S. at 769; *United States v. Doe*, 465 U.S. 605, 612-14 (1984) (compelled production of business records). The Court reasoned "that the act of production could constitute protected testimonial communication because it might entail implicit statements of fact: by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession, and were authentic." *Doe*, 487 U.S. at 209 (citations omitted).

B

In the instant case, Sweets was not compelled to make any verbal or written statement on May 17, 2004. But he was compelled (arguendo) to act in "producing" Long. Thus, applying this "act-of-production" doctrine, we recognize the possibility that Sweets' act of

leading the police to Long might have some testimonial content. *See Fisher*, 425 U.S. at 410 ("the act of producing evidence in response to a subpoena nonetheless has communicative aspects of its own, wholly aside from the contents of the papers produced"). In this case, however, the testimony latent in the act of production still does not create a Fifth Amendment violation, because this latent testimony does not incriminate Sweets in any real and substantial way. *See Doe*, 465 U.S. at 614 n.13 ("a party who wishes to claim the Fifth Amendment privilege must be confronted by substantial and real, and not merely trifling or imaginary hazards of incrimination") (citations omitted)); *Marchetti v. United States*, 390 U.S. 39, 53 (1968); *Heike v. United States*, 227 U.S. 131, 144 (1913).

The testimony latent in Sweets' production of Long could only be that Sweets was admitting (1) that he knew Long or (2) that he knew Long's location. But neither admission substantially incriminates Sweets. The fact that Sweets knew Long, a drug conspirator and a murder suspect, does not suggest that Sweets himself was a drug conspirator or a murder suspect. While knowing Long's location when the police were looking for him might theoretically admit to more, in the context of this case, Sweets' knowledge of Long's location added nothing to the store of knowledge that the police had as to *Sweets' role* in any criminal offense. The police already knew that Sweets knew Long and that he might know of his whereabouts. Because the police already knew that Sweets knew Long and possibly knew his location — indeed that is why they asked Sweets about Long's location — the act of production itself "add[ed] little or nothing to the sum total of the government's information so as to form the basis of a Fifth Amendment claim." *See United States v. Stone*, 976 F.2d 909, 911 (4th Cir. 1992) (per curiam). It does not help Sweets' position to argue that the coerced disclosure of Long "incidentally provided information" to the police because Long later agreed to testify against Sweets and implicate Sweets with the drugs and drug paraphernalia discovered in Long's hotel. *See New York v. Quarles*, 467 U.S. 649, 666, 670-71 (1984) (O'Connor, J., concurring) ("interrogation which provides leads to other evidence does not offend the values underlying the Fifth Amendment privilege any more than the compulsory taking of blood samples, fingerprints, or voice exemplars, all of which may be compelled in an 'attempt to discover evidence that might be used to prosecute [a defendant] for a criminal offense'").

Even though we conclude that there was no incriminating quality to knowledge of Long's location, the government nonetheless did not seek to prosecute Sweets on some basis that he knew of Long's location. Sweets was not the primary target of the investigation and indeed was not arrested for criminal conduct until some six months later, and then for murder. Thus, any incidentally incriminating character of Sweets' act neither added to police knowledge nor was an object of police investigation.

C

Any doubt about whether a Fifth Amendment violation occurred was eliminated when the government agreed not to use Sweets' act of producing Long against him at trial. Indeed, the government agreed not to use *any* evidence of the May 2004 questioning of Sweets, and it did not introduce either the specific location of the hotel in which Long was arrested or how police came to that location. Because the government readily agreed not to use evidence that was even arguably tainted, any testimonial character to Sweets' act did not "furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). It therefore cannot be claimed that the government used at trial any "testimony" of Sweets, whether explicit or latent, that Sweets might have given on May 17, 2004.

Thus, we readily conclude that in coercing Sweets to reveal the location of Long, the government did not compel Sweets to be "a witness against himself," in violation of the Fifth Amendment.

D

Even were Sweets' arguments accepted that police conduct on May 17, 2004, somehow violated Sweets' Fifth Amendment rights, any exclusionary rule that would exist to protect those rights would still have permitted Long to testify and to authenticate the drugs and drug paraphernalia found in his hotel room. Whether the theory for admitting the witness' testimony would be that the testimony was sufficiently attenuated from the unconstitutional act to dissipate the constitutional taint; that the police would inevitably have discovered the witness whose testimony was offered; or that the evidence was

sourced independent of the illegality, the in-court testimony of a live witness should rarely if ever be suppressed. *See United States v. Ceccolini*, 435 U.S. 268, 280 (1978) (concluding that live witness testimony should be excluded much less often than other unlawfully obtained evidence). Here, the attenuation between Sweets' coerced revelation of Long's location and Long's subsequent in-court testimony strongly supports the admission of the testimony. Long's independent acts of will to plead guilty and testify against Sweets, as well as the lapse of time between the May 17, 2004 events and Sweets' trial in September 2005, utterly undermine any connection between the purported constitutional violation and the testimony of the witness Long. Moreover, "we may not ignore the 'enormous cost' of [permanently silencing witnesses] in light of the deterrent purpose of the exclusionary rule." *United States v. Gray*, No. 05-4397, slip op. at 25 (4th Cir. July 2, 2007).

Taken as a whole, Sweets' argument presents a mistaken but common view of the Fifth Amendment's self-incrimination clause as a "right to be free from coercive custodial interrogation." The Amendment, however, says no such thing. Rather, the right against self-incrimination is a *trial right* aimed at protecting the accused from the indignity of being compelled to give testimony against himself. *See Withrow v. Williams*, 507 U.S. 680, 692 (1993). At its center is the right of the accused not to have his own statements introduced against him at trial. *Patane*, 542 U.S. at 637. Efforts to protect against such a violation, therefore, must not degenerate to a judicially-created code of pretrial police conduct, as Sweets would have it. While certain doctrines have arisen to protect the Fifth Amendment trial right, such as *Miranda* and the fruit-of-the-poisonous-tree doctrine, the course advocated by Sweets would do far more than protect him from serving as a witness against himself. It would indeed tend to convert the trial right to a general pretrial code of police procedure in conducting investigations.[2]

---

[2]While the Due Process Clause of the Fifth Amendment provides protections against some pretrial police conduct insofar as it "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), the Due Process Clause is not at issue here.

In rejecting this approach, we adhere to the text of the constitutional protection that no person "shall be compelled in any criminal case to be a *witness against himself*." U.S. Const., amend. V (emphasis added). Thus, "if person A takes the stand to testify against defendant B, this is not the same as forcing B to be a witness against himself, even if B's compelled pretrial statement led the police to learn of A's existence and information." Akhil Reed Amar & Renee B. Lettow, *Fifth Amendment First Principles: The Self-Incrimination Clause*, 93 Mich. L. Rev. 857, 900 (1995).

As the district court concluded, Sweets' trial right against self-incrimination was never touched by his coerced disclosure. Even though physical evidence and the testimony of a co-conspirator were introduced against him at trial, his own statements never were.

## III

Sweets also argues that his incriminating tape-recorded statement given on November 19, 2004, should have been suppressed because (1) after he was arrested on that date, he requested an attorney and was denied one; and (2) his taped statement was given to police following his giving a similar untaped statement which, he alleges, was not preceded by a *Miranda* warning. He argues that this taped statement was obtained pursuant to a police strategy to get an unwarned, unrecorded statement and then get a warned and recorded statement based on the unwarned statement. *See Missouri v. Seibert*, 542 U.S. 600, 618 (Kennedy, J., concurring) (noting that use of intentional question-then-warn strategy would render subsequent warned confessions inadmissible). The district court, however, rejected Sweets' claims simply on the basis of factual findings.

The court found that after police arrested Sweets on November 19, 2004, they requested, without giving Sweets a *Miranda* warning, that Sweets take them to his co-conspirator Maurice Green. Sweets complied, and after he and the police found Green, the police took Sweets to the police station for questioning. The district court found that at no point prior to arriving at the police station (or thereafter) did Sweets ask for an attorney. The court also found that as he led the police to Green, Sweets was not interrogated about his own case —

only about the whereabouts of Green. The district court assumed that during this process, Sweets was not given *Miranda* warnings.

After finding Green, the police took Sweets to the police station, and Detective Glenn, who had not been involved in the earlier process of finding and arresting Green, began to interrogate Sweets shortly after 12:20 a.m. The court found that before beginning, Detective Glenn gave Sweets a *Miranda* warning and had him sign a form to confirm the warning. The court also noted that the form acknowledging and waiving the *Miranda* rights was given before Glenn's questioning actually began. As the court stated:

> *Miranda* rights were fully explained to Mr. Sweets [after the questioning about the whereabouts of Green but] before the later questioning by Detective Glenn took place. As I say, the difference in time, the difference in location, the fact it was a separate officer and the fact that the first questions related to the whereabouts of Mr. Green rather than Mr. Sweets' personal involvement, I think all bring this case much more under *Mashburn* and *Oregon v. Elstad* than the . . . unusual circumstance in *Seibert* where there was a basis to find an intentional first violation of *Miranda* to get a confession.

> *     *     *

> And it's at 12:25 [a.m.] that he's advised of those rights. They're explained to him. Each one is initialed. It's signed and at that point, there is an interview I find by Detective Glenn in the company of Detective Carew. . . . There's an interview with Mr. Sweets after, as I say, after full *Miranda* rights have been provided and *Miranda* rights have been waived.

The tape recording itself was not made until over an hour later, at 1:40 a.m., and discloses that Sweets was again given his *Miranda* warnings at the beginning of the taped interview.

Based on the testimony of Detective Glenn, the *Miranda* waiver forms, and the other matters in the record, we conclude that the district court's factual findings were not clearly erroneous.

IV

Finally, Sweets requests a new trial because the government did not disclose grand jury testimony that contradicted Long's trial testimony, in violation of *United States v. Giglio*, 405 U.S. 150 (1972); *see also Brady*, 373 U.S. at 83. Before the grand jury, Long testified that Sweets had shot at a rival drug gang on a particular occasion. At trial, Long testified that Sweets drove the vehicle and *was not* the shooter.

There are two problems with Sweets' argument. First, he concedes the fact that he *did* receive the grand jury transcript in plenty of time prior to trial. Thus, there could be no violation of *Giglio* — the government met its disclosure obligation. Second, any violation would be harmless because it is inconceivable that Sweets would have impeached Long because he had previously testified that Sweets had shot at somebody, but at trial indicated that Sweets was in fact *not* the shooter. Sweets would be arguing that Long was untrustworthy, but only by revealing that Sweets might have been the shooter.

The judgment of the district court is

*AFFIRMED.*

MICHAEL, Circuit Judge, concurring in part and concurring in the judgment in part:

I concur in parts II.A, III, and IV of the majority's opinion. My main disagreement is with Judge Niemeyer's separate reasoning and conclusion that James Sweets's police-compelled disclosure of John Long's location does not implicate Sweets's Fifth Amendment rights. Nevertheless, I concur in part II's judgment affirming the district court's denial of Sweets's motion to suppress because the exclusionary rule would not bar Long's testimony, and Sweets waived his objection to the admission of the physical evidence seized in Long's hotel room.

I.

"To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth*

*Judicial Dist. Court*, 542 U.S. 177, 189 (2004). The majority assumes, as do I, that Sweets's act of producing Long was compelled. For the reasons mentioned below, I conclude that this act was also testimonial and incriminating, thus triggering the protections of the Fifth Amendment.

Sweets's act of producing Long was testimonial because it "relate[d] a factual assertion" and "disclose[d] information" to the police. *Doe v. United States*, 487 U.S. 201, 210 (1988); *see also United States v. Hubbell*, 530 U.S. 27, 36 n.19 (2000) (stating that "the Fifth Amendment privilege against self-incrimination applies to acts that imply assertions of fact"). Specifically, in taking the police to Long's hotel room, Sweets revealed that he knew Long and that he knew where Long was hiding. *Cf. United States v. Doe*, 465 U.S. 605, 613 (1984) (stating that by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic). During the trip to the hotel, Sweets also admitted that he knew Long had used a different name to rent the room.

Sweets's production of Long was also incriminating. A communication is incriminating for purposes of the Fifth Amendment if it "could be used in a criminal prosecution or could lead to other evidence that might be so used." *Hiibel*, 542 U.S. at 190 (quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972)). Sweets's disclosure of Long's hotel room was incriminating because it led to the following information that was admitted against him at trial: (1) the location of a member of a drug trafficking conspiracy of which Sweets was a member, (2) physical evidence of that conspiracy, including drugs, drug money, and drug paraphernalia, and (3) the location of a place where Sweets had previously purchased large quantities of drugs.

Judge Niemeyer's conclusion that Sweets's production of Long did not implicate the Fifth Amendment is based on the mistaken belief that only facially incriminating statements are protected. *See ante* at 8 ("The fact that Sweets knew Long, a drug conspirator and a murder suspect," and knew Long's location, "does not suggest that Sweets himself was a drug conspirator or a murder suspect."). The protections of the Fifth Amendment are much broader than Judge Niemeyer suggests. "It has . . . long been settled that [the Fifth Amendment's]

protection encompasses compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence." *Hubbell*, 530 U.S. at 37; *accord Kastigar*, 406 U.S. at 445 (holding that the Amendment "protects against any disclosures that could be used in a criminal prosecution or could lead to other evidence that might be so used"); *Hoffman v. United States*, 341 U.S. 479, 486 (1951) (stating that the privilege extends to statements "which would furnish a link in the chain of evidence needed to prosecute" the declarant); *Hiibel*, 542 U.S. at 190 (same); *Doe*, 487 U.S. at 211 n.10 (stating that the Fifth Amendment protects compelled disclosure of facts "that might serve as or lead to incriminating evidence"). Although Sweets's communication itself was not inculpatory, it led to evidence that directly implicated him in a drug trafficking conspiracy.

Judge Niemeyer's statement that Sweets's communication to the police was not "substantially incriminat[ing]," *ante* at 8, is also problematic because it suggests that a compelled statement is not protected by the Fifth Amendment unless it is *substantially* incriminating. This interpretation is inconsistent with Supreme Court precedent. In *Doe* and *Marchetti*, the cases cited by Judge Niemeyer, the Supreme Court stated that a witness cannot assert his Fifth Amendment rights unless the *risk* of incrimination is substantial and real. *Doe*, 465 U.S. at 614 n.13 (stating that producing subpoenaed records presented a substantial "risk of incrimination"); *Marchetti*, 390 U.S. at 54 (holding that business owner could assert Fifth Amendment in refusing to register business as engaged in accepting wagers because registration requirement posed a real risk of future prosecution). In other words, the likelihood, not the degree, of incrimination must be substantial to trigger the Fifth Amendment protections. There is no support for Judge Niemeyer's assertion that a compelled incriminating statement is not protected unless it substantially incriminates the speaker.

In sum, the May 2004 interrogation of Sweets implicated the Fifth Amendment's protections. The police compelled Sweets to disclose factual information (Long's location) by threatening to detain his girlfriend and her nephew until Sweets cooperated. Sweets's testimonial communication was incriminating because it led to evidence that directly implicated him in a drug trafficking conspiracy.

## II.

The Fifth Amendment prohibits Sweets's coerced testimonial communication and its fruits from being admitted against him at trial.* In *United States v. Patane* the Supreme Court reaffirmed "that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." 542 U.S. 630, 640 (2004) (emphasis in original) (quoting *Chavez v. Martinez*, 538 U.S. 760, 769 (2003)). Because we assume that Sweets's communication was coerced, we must apply the traditional fruit of the poisonous tree analysis to determine whether evidence derived from that communication (Long's testimony and the contraband seized at the hotel) should have been excluded at trial.

---

*Judge Niemeyer also concludes that Sweets's Fifth Amendment right was not violated because "[e]ven though physical evidence and the testimony of a co-conspirator were introduced against him at trial, his own statements never were." *Ante* at 11. The question on appeal is not whether Long's testimony violated Sweets's Fifth Amendment right, but whether it was barred by the exclusionary rule. The exclusionary rule bars the admission, for most purposes, of evidence acquired in violation of the Fifth Amendment's prophylactic rules. These prophylactic rules, which safeguard a defendant's privilege against self-incrimination, "necessarily sweep beyond the actual protections of the Self-Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 639 (2004). The *Miranda* prophylactic (and constitutional) rule, for example, creates a presumption that unwarned statements made during custodial interrogation are compelled. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (stating that *Miranda* is a constitutional rule). "Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence," thereby providing "a remedy even to the defendant who has suffered no identifiable constitutional harm." *Elstad*, 470 U.S. at 307. Thus, it is well-established that the exclusionary rule "may be triggered even in the absence of a Fifth Amendment violation." *Id.* at 306. Judge Niemeyer's conclusion that Sweets's Fifth Amendment right was not violated ignores the prophylactic rule that requires the exclusion of evidence derived from compelled statements. *See Patane*, 542 U.S. at 640.

I ultimately agree with the majority that Long's testimony was properly admitted because it was sufficiently attenuated from Sweets's coerced communication. The Supreme Court has recognized that improper police conduct that leads to the discovery of a witness "very often will not play any meaningful part in the witness' willingness to testify." *United States v. Ceccolini*, 435 U.S. 268, 277 (1978). Accordingly, in determining whether live-witness testimony is sufficiently attenuated from the initial coercive police interrogation, we look primarily to the "degree of free will" exercised by the witness in deciding whether to testify against the defendant. *Id.* at 276. The free will inquiry is supplemented by the examination of the following additional factors: (1) whether the coerced communication was used in questioning the testifying witness; (2) the time between the coercive interrogation and the initial contact with the witness; (3) whether the investigators had prior knowledge of the relationship between the witness and the defendant; and (4) whether the police conducted the coercive interrogation with the purpose of implicating the defendant. *See United States v. McKinnon*, 92 F.3d 244, 247-48 (4th Cir. 1996) (citing *Ceccolini*, 435 U.S. at 279-80).

After considering these factors, I believe that Long's testimony was sufficiently attenuated from Sweets's compelled communication. First, the facts disclosed by Sweets were not used in questioning Long. Second, although the police located and arrested Long shortly after Sweets was interrogated, Long's decision to testify against Sweets occurred over a year later. Third, the police had prior knowledge of Long and his relationship with Sweets. Fourth, the police did not commit the coercive interrogation of Sweets with the intent to discover incriminating evidence against him. In sum, there is no reason to believe that Long's decision to testify against Sweets was not the product of his own free will. His testimony was therefore sufficiently attenuated from Sweets's compelled communication and was properly admitted at trial.

The contraband seized from Long's hotel room was also derived from Sweets's production of Long. Sweets did not object to the admission of this evidence at trial, but he makes a perfunctory challenge to its admission on appeal. *See* Appellant's Br. at 16 (claiming generally that "[e]vidence derived from James Sweets' May 2004 compelled statements should not have been used against Sweets at

trial"). Although we have the discretion to correct plain errors not raised at trial, *see* Fed. R. Crim. P. 52(b), plain error review is not appropriate in this instance. *See United States v. Young*, 470 U.S. 1, 15 (1985) (stating that "the plain-error exception to the contemporaneous-objection rule is to be 'used sparingly'"). Because Sweets did not object to the physical evidence at trial, the government did not have the opportunity to advocate its admissibility under one of the exceptions to the exclusionary rule, such as the inevitable discovery doctrine. *See Nix v. Williams*, 467 U.S. 431 (1984). We are thus unable to determine whether admission of the evidence was plain error because the relevant facts were not developed in the district court. *See United States v. Easter*, 981 F.2d 1549, 1556 (10th Cir. 1992) (refusing to review for plain error because the defendant failed to raise a "fact-dependent issue in the court below").

For these reasons, I agree with the majority's decision to affirm the district court's order denying Sweets's motion to suppress.

GOODWIN, District Judge, concurring in part and concurring in the result:

I concur in the judgment affirming the district court. I do not join in part II-B of the majority opinion for two reasons. I would not have addressed whether Sweets's Fifth Amendment rights were violated. First, Sweets's "testimony" was not used at trial. Second, Long's testimony was admissible whether or not Sweets's rights had been violated. Any possible taint of Long's testimony had dissipated before he testified at trial. Further in part II-D, I would have omitted the discussion of the Fifth Amendment.

With that said, I join in Parts I, II-A, II-C (to the extent that I agree that Mr. Sweets's testimony was not used against him at trial), the first paragraph of II-D, III and IV.