IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38763-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CLAUDE L. MERRITT, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, A.C.J. — Claude L. Roy Merritt appeals his convictions for first degree felony murder, second degree felony murder, first degree manslaughter, first degree kidnapping, tampering with physical evidence, unlawful disposal of remains, and failure to notify the coroner of the location of human remains.

He raises several worthy issues on appeal and the State correctly concedes to most of the issues. We accept the State's concessions. This leaves only two contested issues. We conclude that the coroner notification statute, as applied to the facts here, violated Merritt's right against self-incrimination under the Fifth Amendment to the United States Constitution. We also conclude that the State, when charging felony murder, need not list the elements of the predicate felony. We remand for resentencing.

FACTS

Just after midnight on September 15, 2020, Jason Fox sent two text messages to his former roommate: "22 Yergens rd" and "Just incade [sic] anything happens to me." Ex. 147. The next day, a relative reported Fox missing.

22 Yergens Road is a partially forested, 50-acre property abutting the Pend Oreille River, consisting of multiple buildings, a wedding venue, a shop with two apartments on the upper floor, and a tiny house. At the time, several people lived at 22 Yergens Road, including Claude Merritt, Riley Hillestad, and Matthew Raddatz-Freeman and his wife, Amanda Pierson.

On September 17, the day after Fox was reported missing, law enforcement went to the rural property looking for him. The officers encountered Merritt, along with some of the other residents, and questioned them about Fox's whereabouts. Merritt told the officers he had not seen Fox in about two weeks.

On September 21, law enforcement requested an emergency ping of Fox's cell phone. The ping did not return a location, but the phone provider notified law enforcement that Fox's phone was last active in the vicinity of 22 Yergens Road. Based on this information, law enforcement returned to the rural property where they again encountered Merritt and the other residents. Merritt's story changed. He told the

deputies that Fox was at the property the night in question but was escorted off after a conflict and drove away. The next day, Fox's car was found abandoned in a remote wooded area outside of Libby, Montana.

On October 3, law enforcement and a team of human remains detection dogs searched the rural property with the permission of one of the property owners. The next day, after an extensive search, they found Fox's body buried in a wooded area with his hands tied with a strap behind his back. Fox's skull was fractured on the right side and depressed into his cranial cavity.

A forensic pathologist conducted an autopsy. The doctor concluded that Fox's death was caused by a strike to the right side of his head with a relatively heavy and blunt object, but he was unable to determine what type of object caused the injury.

On November 7, law enforcement developed a plan to locate and interview the persons of interest in the murder of Fox, including Merritt. Pend Oreille County Sheriff's Deputy Travis Stigall, along with two other deputies, interviewed Merritt. During the interview, Merritt told Deputy Stigall that Fox went to the property on September 14 and that there was a conflict between Fox and Raddatz-Freeman. Raddatz-Freeman wanted to beat up Fox, but Merritt told the deputy that he intervened and followed Fox off the property. Deputy Stigall told Merritt that Fox had been killed, to which Merritt replied, "I

know I didn't do it.  Like 100%.  I would not hurt that kid for the life of me at all."

Rep. of Proc. (RP) at 1635.  At that point, Merritt's story again changed.

Deputy Stigall asked Merritt who would have killed Fox.  Merritt replied without

hesitation that it was Raddatz-Freeman and Hillestad and described how they used their

hands and feet and "[b]eat the shit out of him."  RP at 1637.  Merritt said this occurred

inside the shop building, that he was present, and he was told that if he said anything, he

would "'be right there with [Fox].'"  RP at 1638.

Merritt told Deputy Stigall that Raddatz-Freeman and Hillestad closed all the doors

and locked him inside the shop and that Hillestad stood with his gun and said nobody was

going anywhere.  Merritt explained that when he told the group he invited Fox out to the

property, Hillestad became upset and started yelling.  The next thing Merritt knew, Fox

was beat up and the others tied up Fox to take him outside.

Merritt told Deputy Stigall that Fox was walking when they took him outside the

shop, but he did not know what happened after that.  He said only Raddatz-Freeman and

Hillestad led Fox outside.  Merritt said he heard a skid steer[1] running after that, until

around 2:00 a.m. in the morning.  He believed Raddatz-Freeman and Hillestad were going

---

[1] A skid steer is a four-wheeled or tracked, small construction vehicle used for small excavation projects.

to bury Fox in the woods because he heard them talk about burying Fox there. He said

Raddatz-Freeman and Hillestad told him to clean up the blood from the shop floor, and he

cleaned the blood using Pine Sol. The next morning, September 15, Raddatz-Freeman

told Merritt that Fox had been killed.

*Procedure*

The State charged Merritt with three homicide offenses: count 1, first degree

felony murder; count 2, second degree felony murder; and count 3, first degree

manslaughter as a principal and/or accomplice. In addition, the State charged him with

various other offenses: count 4, first degree kidnapping; count 5, unauthorized removal or

concealment of a body; count 6, tampering with physical evidence; count 7, unlawful

disposal of remains; and count 8, failure to notify a coroner.

In the middle of Merritt's trial, Raddatz-Freeman entered into a plea deal which,

for a reduced sentence, required him to testify. Raddatz-Freeman testified that on the

night of Fox's murder, both he and Fox were inside the shop, along with Merritt,

Hillestad, and another individual, Kevin Belding. He testified that Hillestad hit and then

kicked Fox in the face. He said Merritt also grabbed Fox by the back of the head and

kneed him in the face. Raddatz-Freeman did not know who tied up Fox but said Merritt

led Fox through the back door of the shop.

5

Raddatz-Freeman testified that Merritt put Fox on the back of a Ranger—a four-wheel drive, side-by-side utility vehicle—and that someone drove it back into the tree line. He said he eventually followed the Ranger and saw Merritt standing in the bed of the Ranger, stomping on something. He also saw Hillestad digging a hole using the skid steer. Once the hole was dug, Merritt took Fox out of the Ranger's bed, walked him to the hole, and placed him on his knees.

Raddatz-Freeman testified that he told Merritt that he should stop what he was doing and leave. Merritt then drove away in the Ranger. Raddatz-Freeman said he left but returned soon after. He saw Hillestad in the skid steer, which was stationary, with the bucket of the machine on Fox, with Fox's legs kicking wildly. At that point, Raddatz-Freeman got back inside the Ranger and drove away without trying to stop Hillestad.

Raddatz-Freeman testified that a few days later, the group all got together because Hillestad wanted to tell them, just once, what happened. Hillestad told them he had pushed Fox into the hole and was planning on covering him with the dirt when Fox got out of the hole and ran. Hillestad said that he chased Fox down with the skid steer, that Fox tripped and fell, and that he scooped Fox up in the bucket of the skid steer and put

6

him in the hole.[2]  Raddatz-Freeman testified that they agreed, if questioned, to all say they had not seen Fox for a couple of months.

At the close of the State's case, Merritt moved to dismiss count 5, unauthorized removal or concealment of a body, arguing that the information failed to include the mens rea element of the crime.  The State conceded and stipulated to dismissal of count 5.  Later, the jury returned guilty verdicts on counts 1, 2, 3, 4, 6, and 8, and a not guilty verdict on count 7.

*Sentencing*

At sentencing, the parties debated whether double jeopardy and merger required a number of convictions to be omitted from the judgment and sentence, and whether a California conviction for unlawful driving or taking of a vehicle should be included in Merritt's offender score.  The trial court mostly agreed with the State.  The court listed all of the convictions in the judgment and sentence, omitted those that merged from the offender score, and included the California conviction in the offender score.[3]

---

[2] We infer that when Raddatz-Freeman had seen Fox with the bucket pinning him to the ground, it was after Fox had fallen but before Hillestad killed him and scooped him up.

[3] We note that the court entered a sentence on count 5, even though it dismissed that charge.  To forestall the filing of a personal restraint petition, the parties, on remand, may want to address this.

7

The court found Merritt to be indigent and imposed a $500.00 victim penalty

assessment (VPA) and a $100.00 DNA collection fee.  It entered an order for restitution

in the amount of $1,993.62 and interest on that amount at the rate applicable to civil

judgments.

Merritt timely appealed.

## ANALYSIS

DOUBLE JEOPARDY

Merritt contends the sentencing court violated double jeopardy by including the

convictions and sentences for counts 2 and 3 in his judgment and sentence.  The State

concedes error.  We accept the State's concession.

We review issues of double jeopardy de novo.  *State v. Womac*, 160 Wn.2d 643,

649, 160 P.3d 40 (2007).  A double jeopardy claim may be raised for the first time on

appeal.  *State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006).

The double jeopardy clause of the United States Constitution and the Washington

Constitution prohibit the imposition of multiple punishments for the same criminal

conduct.  *State v. Turner*, 169 Wn.2d 448, 454, 238 P.3d 461 (2010); U.S. CONST.

amend. V; WASH. CONST. art I, § 9.  In instances where a jury finds a defendant guilty of

multiple counts for the same conduct, the trial court does not violate double jeopardy

protections if it enters a judgment and sentence referring to only the greater charge.

*Turner*, 169 Wn.2d at 462. A court may violate double jeopardy either by reducing to

judgment both the greater and lesser of multiple convictions for the same offense or by

conditionally vacating the lesser conviction while directing that the conviction

nonetheless remains valid. *Id*. at 464.

Double jeopardy concerns arise in the presence of multiple convictions, regardless

of whether resulting sentences are imposed concurrently. *State v. Calle*, 125 Wn.2d 769,

773, 888 P.2d 155 (1995). Even if only one sentence is entered for multiple convictions,

"the stigma and impeachment value of multiple convictions remain." *Id*. at 774. The

proper remedy in these situations is to remand for the sentencing court to vacate the lesser

convictions and remove any reference to them from the judgment and sentence. *See*

*Turner*, 169 Wn.2d at 465-66.

Here, the jury found Merritt guilty of three homicide offenses: count 1, first degree

felony murder; count 2, second degree felony murder; and count 3, first degree

manslaughter. At sentencing, when discussing Merritt's offender score, the court stated

that the "controlling offense is going to be that murder I." RP at 2284. Defense counsel

asked whether the court was vacating the other convictions or whether it would list them

on the judgment and sentence. The court responded that the three offenses merged but

stated that "they don't go away." RP at 2285. The prosecutor requested clarification on how to address the convictions for counts 2 and 3 in the judgment and sentence. The court responded, "Top end on everything to run concurrently." RP at 2321.

The trial court violated double jeopardy when it included the convictions and sentences on counts 2 and 3 in the judgment and sentence after it indicated that count 1 was the controlling offense. We remand for the court to vacate the convictions on counts 2 and 3 and remove reference to them from the judgment and sentence.

MERGER

Merritt contends the sentencing court erred when it entered a conviction and sentence in his judgment and sentence for count 4, first degree kidnapping, after concluding that it merged with count 1, first degree felony murder. The State concedes error. We accept the State's concession.

The merger doctrine is a tool of statutory interpretation used to determine whether the legislature intended to impose multiple punishments for a single act that violates several statutory provisions. *State v. Michielli*, 132 Wn.2d 229, 238, 937 P.2d 587 (1997). If in order to prove a particular degree of a crime the State must prove the elements of that crime and also that the defendant committed an act that is defined as a separate crime elsewhere in the criminal statutes, the second crime merges with the first.

10

*State v. Vladovic*, 99 Wn.2d 413, 420-22, 662 P.2d 853 (1983). Generally, a predicate

offense will merge into the second crime and the court may not punish the predicate crime

separately. *State v. Saunders*, 120 Wn. App. 800, 821, 86 P.3d 232 (2004). The remedy

for a merger violation is to remand for the sentencing court to vacate the conviction for

the lesser offense. *See State v. Muhammad*, 194 Wn.2d 577, 628 (Gordon McCloud, J.,

concurring), 637 (Madsen, J., dissenting in part), 451 P.3d 1060 (2019) (plurality

opinion).

In *Muhammad*, our Supreme Court determined that the predicate felony of first

degree rape merged with first degree felony murder. *Id.* at 617-23 (Gordon McCloud, J.,

concurring), 628 (Madsen, J., dissenting in part). The court reasoned that "[f]irst degree

rape is unquestionably a lesser included offense of felony murder based on first degree

rape" because "the felony murder statute incorporates the elements of first degree rape by

reference." *Id*. at 618 (Gordon McCloud, J., concurring) (citing RCW 9A.32.030(1)(c)).

"In other words, the legislature has clearly indicated that in order to prove first degree

felony murder, the State must prove not only that the defendant caused someone's death

but also that the killing was accompanied by rape, which is defined as a crime elsewhere

in the criminal statutes." *Id*. at 618-19 (Gordon McCloud, J., concurring).

Similarly, here, first degree kidnapping is a lesser included offense of felony murder based on first degree kidnapping. The first degree felony murder statute explicitly incorporates the crime of first degree kidnapping within its definition. RCW 9A.32.030(1)(c)(5). Accordingly, the trial court correctly ruled that Merritt's conviction on count 4 for first degree kidnapping merged with his conviction on count 1 for first degree felony murder, based on first degree kidnapping. However, the judgment and sentence references the conviction and sentence for count 4. The parties agree that the trial court erred when it failed to vacate the conviction on count 4 in the judgment and sentence after finding that the conviction merged with count 1. We agree. We remand for the sentencing court to vacate the conviction for first degree kidnapping and to remove the reference to count 4 from the judgment and sentence.

COMPARABILITY OF CALIFORNIA CONVICTION NOT ESTABLISHED

Merritt argues the sentencing court erred when it found his California conviction for unlawful taking of a vehicle comparable to the Washington offense of taking a motor vehicle in the second degree. He argues the State did not prove the California offense was legally or factually comparable to a Washington offense. The State concedes error. We accept the State's concession.

Prior out-of-state convictions may be counted in an offender score if they are comparable to a Washington crime. RCW 9.94A.525(3). This ensures that defendants with equivalent convictions are treated equally regardless of whether the prior convictions were incurred in Washington or elsewhere. *State v. Markovich*, 19 Wn. App. 2d 157, 172-73, 492 P.3d 206 (2021), *review denied*, 198 Wn.2d 1036, 501 P.3d 141 (2022). The State must prove the existence and comparability of all foreign convictions. *State v. Ford*, 137 Wn.2d 472, 480, 973 P.2d 452 (1999). "'Comparability is both a legal and a factual question.'" *State v. Wilson*, 170 Wn.2d 682, 690, 244 P.3d 950 (2010) (quoting *State v. Collins*, 144 Wn. App. 547, 553, 182 P.3d 1016 (2008)). We review comparability of convictions de novo. *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187 (2014).

To determine whether an out-of-state conviction counts toward the defendant's offender score, the sentencing court compares the elements of the out-of-state crime with the elements of potentially comparable Washington crimes and makes a factual determination as to whether the crimes are comparable. *State v. Morley*, 134 Wn.2d 588, 605-06, 952 P.2d 167 (1998). "[T]he elements of the out-of-state crime must be compared to the elements of Washington criminal statutes in effect when the foreign crime was committed." *Id.* at 606. If the two crimes are comparable, the out-of-state

13

conviction can be included in the offender score. *State v. Thiefault*, 160 Wn.2d 409, 415, 158 P.3d 580 (2007).

Washington has a two-part analysis for determining whether an out-of-state conviction is comparable to a Washington conviction. *Id.* First, the trial court determines whether the crimes are *legally* comparable—whether the elements of the out-of-state crime are substantially similar to the elements of the Washington crime. *Id.* If the elements of the out-of-state crime are broader than the elements of the Washington crime, they are not legally comparable. *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 258, 111 P.3d 837 (2005).

Second, even if the crimes are not legally comparable, the sentencing court can still include the out-of-state conviction in the offender score if the crime is *factually* comparable. *See Thiefault*, 160 Wn.2d at 415. Determining factual comparability involves analyzing whether the defendant's conduct underlying the out-of-state conviction would have violated the comparable Washington statute. *Id.* In this step, we consider only facts that were previously admitted, stipulated to, or proved beyond a reasonable doubt. *State v. Davis*, 3 Wn. App. 2d 763, 772, 418 P.3d 199 (2018).

If an out-of-state conviction involves a crime that is neither legally nor factually comparable to a Washington crime, the sentencing court may not include the conviction in the defendant's offender score. *Thiefault*, 160 Wn.2d at 415.

Here, the sentencing court concluded that Merritt's California conviction for unlawful taking of a vehicle was comparable to the Washington offense of taking a motor vehicle without permission in the second degree and added one point to his offender score for his California conviction.

RCW 9A.56.075(1), Washington's taking a motor vehicle without permission in the second degree statute, provides:

> A person is guilty of taking a *motor vehicle* without permission in the second degree if he or she, without the permission of the owner or person entitled to possession, intentionally takes or drives away *any automobile or motor vehicle, whether propelled by steam, electricity, or internal combustion engine*, that is the property of another, or he or she voluntarily rides in or upon the automobile or motor vehicle with knowledge of the fact that the automobile or motor vehicle was unlawfully taken.

(Emphasis added.)

RCW 46.04.320(1) defines "motor vehicle" as "'a vehicle that is self-propelled or a vehicle that is propelled by electric power obtained from overhead trolley wires but not operated upon rails.'" *State v. Van Wolvelaere*, 195 Wn.2d 597, 601, 461 P.3d 1173 (2020).

15

Under California Vehicle Code § 10851(a), California's theft and unlawful driving

or taking of a vehicle code,

> Any person who drives or takes *a vehicle* not his or her own, without the
> consent of the owner thereof, and with intent either to permanently or
> temporarily deprive the owner thereof of his or her title to or possession of
> the vehicle, whether with or without intent to steal the vehicle, or any
> person who is a party or an accessory to or an accomplice in the driving or
> unauthorized taking or stealing, is guilty of a public offense and, upon
> conviction thereof, shall be punished by imprisonment in a county jail for
> not more than one year or . . . by a fine of not more than five thousand
> dollars ($5,000), or by both the fine and imprisonment.

(Emphasis added.)

Under California law, "a 'vehicle' is a device by which any person or property may

be propelled, moved, or drawn upon a highway, excepting a device moved exclusively by

human power or used exclusively upon stationary rails or tracks." Cal. Vehicle Code

§ 670.

Merritt argues, and the State concedes, that the statutes are not legally comparable

because the Washington statutes define "motor vehicle" more narrowly than the

California statutes define "vehicle." The parties both point to *People v. Philpot*, 122 Cal.

App. 4th 893, 19 Cal. Rptr. 3d 280 (Cal. Ct. App. 2004), to support their arguments. In

*Philpot*, a California court explained that California Vehicle Code § 10851 "proscribes

the unlawful taking of a 'vehicle,' not the unlawful taking of a 'motor vehicle,'" before

16

concluding that a trailer attached to a truck constituted a "vehicle" under § 10851. *Id.* at 903.

We agree with the parties. The Washington statute is narrower, criminalizing the taking of a motor vehicle, which is defined as self-propelled, while the California statute defines vehicle more broadly to include non-self-propelled vehicles, such as the trailer in *Philpot*. The offenses are therefore not legally comparable, and it was error for the sentencing court to include Merritt's California conviction for unlawful taking of a vehicle in his offender score based on legal comparability.

Because the offenses are not legally comparable, we must determine whether the two offenses are factually comparable. We consider only facts that were previously admitted, stipulated to, or proved beyond a reasonable doubt. *Davis*, 3 Wn. App. 2d at 772. During sentencing, the State relied only on a certified docket showing the California conviction and that Merritt entered a plea of nolo contendere to the original charge. The docket sheet is insufficient for us to review whether the offense is factually comparable to a Washington offense because it does not show proof of the facts of the California conviction, which were admitted, stipulated to, or proved by the State. Remand is therefore appropriate for the court to conduct a factual comparability analysis. *Thiefault*, 160 Wn.2d at 415-17, 420. On remand, the parties must be given the opportunity to

17

present all relevant evidence of criminal history, including criminal history not previously

presented.  RCW 9.94A.530(2).

INSUFFICIENT EVIDENCE TO SUSTAIN TAMPERING CONVICTION

Merritt argues that the State failed to provide sufficient evidence to prove his

tampering with physical evidence conviction.  The State concedes.  We accept the State's

concession.

"The sufficiency of the evidence is a question of constitutional law that we review

de novo."  *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

Due process requires the State to prove all elements of the crime beyond a

reasonable doubt.  *State v. Aver*, 109 Wn.2d 303, 310, 745 P.2d 479 (1987); U.S. CONST.

amend. XIV; WASH. CONST. art. I, § 3.  When a defendant challenges the sufficiency of

the evidence, the proper inquiry is "whether, after viewing the evidence in the light most

favorable to the State, any rational trier of fact could have found guilt beyond a

reasonable doubt."  *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  "[A]ll

reasonable inferences from the evidence must be drawn in favor of the State and

interpreted most strongly against the defendant."  *Id*.  Our review is highly deferential to

the jury's decision.  *State v. Davis*, 182 Wn.2d 222, 227, 340 P.3d 820 (2014).

"A person is guilty of tampering with physical evidence if, having reason to believe that an official proceeding is pending or about to be instituted and acting without legal right or authority, he or she . . . [d]estroys, mutilates, conceals, removes, or alters physical evidence with intent to impair its appearance, character, or availability in such pending or prospective official proceeding." RCW 9A.72.150(1)(a).

"Official proceeding" is defined as "a proceeding heard before any legislative, judicial, administrative, or other government agency or official authorized to hear evidence under oath, including any referee, hearing examiner, commissioner, notary, or other person taking testimony or depositions." RCW 9A.72.010(4).

Both parties agree that the plain language of the tampering with physical evidence statute required the State to prove Merritt (1) destroyed, concealed, or altered physical evidence, (2) with reason to believe an official proceeding was about to begin and with intent to impair the evidence in such a proceeding. We discuss these two elements in turn.

First, both parties acknowledge that Merritt destroyed, concealed, or altered physical evidence by cleaning up the signs of Fox's murder, particularly his blood. We agree. Merritt confessed to cleaning up the shop where Fox was beaten. He told law enforcement that he used Pine Sol to remove blood stains from the floor in the shop the

19

same night Fox was beaten and murdered.  In addition to his admission, forensic scientist Elizabeth Schroeder testified she discovered visible blood stains in the shop building's main floor, including on a door frame, cabinet doors, a wall next to a sink, and the floor. She explained that some of the blood stains showed signs of striations, "like if you take a washcloth at home . . . and you rub that across the countertop."  RP at 1235-36.

Schroeder then continued her search in the upstairs apartment in the shop building, where Merritt told investigators that he lived.  In one of the upstairs bathrooms, Schroeder found visible blood stains on the bathtub and shower wall.  She testified, "there were some indications of dilute blood stains on this tub wall . . . that were just kind of a fainter color."  RP at 1245.  Again, she noted that, like some of the blood stains on the main floor, there were visible striations.  She also testified she found a bleach bottle outside the shop and other cleaning products and bleach containers in trashcans outside the shop. We conclude that the State presented sufficient evidence to prove Merritt destroyed, concealed, or altered physical evidence.

Turning to the second element, both parties agree that the State failed to prove that Merritt knew an official proceeding was about to be instituted when he cleaned up the blood in the shop.  Resolution of this issue turns on our interpretation of the phrase "about to be instituted" as used in RCW 9A.72.150(1).

When interpreting statutory provisions, the primary objective is to ascertain and give effect to the intent and purpose of the legislature in creating the statute. *State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002). To determine legislative intent, we look first to the language of the statute. *Id.* If a statute is clear on its face, its meaning is to be derived from the plain language of the statute alone. *Id.* Legislative definitions in the statute control but in the absence of a statutory definition, we give the terms their plain and ordinary meaning ascertained from a standard dictionary. *Id.* If a statute is ambiguous, we will resort to principles of statutory construction, legislative history, and relevant case law to assist in interpreting it. *Id.* at 955.

Although the phrase "about to be instituted" is not defined in the criminal statutes, both parties agree that the phrase requires that an official proceeding as defined by RCW 9A.72.010(4) will be instituted with some degree of temporal imminence. The parties also agree that the State's evidence does not support an inference that Merritt knew an official proceeding, such as a prosecution, was pending or about to be instituted at the time he cleaned up the blood in the shop.

We conclude insufficient evidence exists to sustain Merritt's tampering with physical evidence conviction. A defendant whose conviction has been reversed due to

insufficient evidence cannot be retried; therefore, dismissal with prejudice is required. *State v. DeVries*, 149 Wn.2d 842, 853, 72 P.3d 748 (2003).

We reverse Merritt's conviction on count 6 and direct the trial court to vacate the conviction and to dismiss the charge with prejudice.

NONDEFECTIVE INFORMATION

Merritt contends the amended information is defective in part because the State failed to list the elements of the predicate felony when it charged him with felony murder.

Both parties acknowledge that Washington law does not require the State to list the elements of the predicate felony in an information charging a defendant with felony murder. Notwithstanding, Merritt argues for a change in the law and states his intention to preserve the issue for review by the Washington Supreme Court. The State similarly advances arguments in favor of the existing law to preserve them for Supreme Court review.

We are bound to follow decisions of the Washington Supreme Court. *State v. Gore*, 101 Wn.2d 481, 486-87, 681 P.2d 227 (1984); *State v. Jussila*, 197 Wn. App. 908, 931, 392 P.3d 1108 (2017). The Supreme Court has long held that the elements of the predicate felony are not essential elements of felony murder and do not have to be included in the information. *See, e.g.*, *State v. Filpot*, 51 Wash. 223, 228, 98 P. 659

(1908); *State v. Ryan*, 192 Wash. 160, 164-65, 73 P.2d 735 (1937); *State v. Anderson*, 10 Wn.2d 167, 180, 116 P.2d 346 (1941). We therefore conclude that the amended information was not defective for failing to allege the elements of the predicate offense for the felony murder charge.

AS-APPLIED CHALLENGE TO CORONER NOTIFICATION STATUTE

Merritt argues for the first time on appeal that RCW 68.50.020, the criminal statute that requires notifying the coroner of the location of human remains, violates his right against self-incrimination, as applied to the facts of his case.

*Standard of review for constitutional "as-applied" challenges*

We review constitutional as-applied challenges de novo. *See City of Seattle v. Evans*, 184 Wn.2d 856, 861-62, 366 P.3d 906 (2015). Although Merritt did not raise this issue in the trial court, a "manifest error affecting a constitutional right" can be raised for the first time on appeal. RAP 2.5(a)(3); *see State v. O'Hara*, 167 Wn.2d 91, 98-99, 217 P.3d 756 (2009). Being charged, convicted, and sentenced pursuant to an unconstitutional charging statute qualifies as a manifest error affecting a constitutional right. *State v. Rice*, 174 Wn.2d 884, 893, 279 P.3d 849 (2012). When reviewing a constitutionality challenge, we presume that statutes are constitutional and place the burden to show unconstitutionality on the challenger. *Evans*, 184 Wn.2d at 861-62.

23

"An as-applied challenge to the constitutional validity of a statute is characterized by a party's allegation that application of the statute in the specific context of the party's actions or intended actions is unconstitutional." *City of Redmond v. Moore*, 151 Wn.2d 664, 668-69, 91 P.3d 875 (2004). Holding a statute unconstitutional as applied prohibits future application of the statute in a similar context, but the statute is not totally invalidated. *Id.*

*The right against self-incrimination standards*

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, Washington's Constitution provides that "[n]o person shall be compelled in any criminal case to give evidence against himself." WASH. CONST. art. I, § 9. "The federal and state provisions give the same level of protection." *In re Dependency of A.M.-S.*, 196 Wn.2d 439, 445, 474 P.3d 560 (2020). The purpose of the right is to make the government obtain evidence on its own and "'to spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government.'" *State v. Easter*, 130 Wn.2d 228, 241, 922 P.2d 1285 (1996) (quoting *Doe v. United States*, 487 U.S. 201, 213, 108 S. Ct. 2341, 101 L. Ed. 2d 184 (1988)).

The right against self-incrimination is liberally construed. *Id.* at 236. "[T]he right

is not limited to testimony given at a trial. Instead, it 'can be asserted in any proceeding,

civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects

against *any disclosures that the witness reasonably believes could be used in a criminal

prosecution or could lead to other evidence that might be so used*.'" *Dependency of

A.M.-S.*, 196 Wn.2d at 445 (quoting *Kastigar v. United States*, 406 U.S. 441, 444-45, 92

S. Ct. 1653, 32 L. Ed. 2d 212 (1972)) (emphasis added).

Fifth Amendment claims generally entail two considerations: (1) whether the

defendant's statements exposed them to a realistic threat of self-incrimination in a

subsequent proceeding and (2) whether the State has sought to impose substantial

penalties because a witness elects to exercise their Fifth Amendment right not to give

incriminating testimony against himself. *State v. Flannery*, 24 Wn. App. 2d 466, 480,

520 P.3d 517 (2022).

The State charged Merritt under RCW 68.50.020, Washington's coroner

notification statute and obtained a conviction. That statute provides:

> It shall be the duty of every person who knows of the existence and location
> of human remains coming under the jurisdiction of the coroner or medical
> examiner . . . to notify the coroner, medical examiner, or law enforcement
> thereof in the most expeditious manner possible, unless such person shall
> have good reason to believe that such notice has already been given. Any
> person knowing of the existence of such human remains and not having

25

good reason to believe that the coroner has notice thereof and who shall fail
to give notice to the coroner as aforesaid, shall be guilty of a misdemeanor.

RCW 68.50.020.

### 1. Realistic threat of incrimination

Merritt contends that if he had notified the coroner, a medical examiner, or law enforcement of the location of Fox's body, his disclosure could have been used in a criminal prosecution. We agree.

Fox was murdered in the early hours of September 15. Raddatz-Freeman testified that Hillestad told the group a few days later that Fox had escaped the hole and tripped and that he scooped Fox up and buried him in the hole. Therefore, on or soon after September 18, Merritt was required by the coroner notification statute to notify an appropriate person of where Fox was buried. As explained below, this could not have been done without Merritt being realistically exposed to prosecution.

The reason Merritt knew the exact location of Fox's body was because he was there as Hillestad dug the hole. Had Merritt shown law enforcement where Fox's body was buried, this would have been circumstantial evidence used in a potential prosecution that Merritt was present when the hole was dug and filled. It would be argued, "How else would he have known where the hole was, and who was in it." This would have

26

realistically exposed Merritt to prosecution for murder or at least unlawful disposal of human remains.

The State argues that Merritt could have complied with the statute by calling the coroner, even anonymously. We disagree. The statute requires a person to notify an appropriate person of the *location* of human remains, not the general location. Merritt, had he called the coroner, would be unable to describe the location of Fox's grave beyond a general description. A person who knows the exact location likely would not have complied with the statute by giving a general description on the telephone; especially where, as here, a general description would not have resulted in the buried body being readily found. Moreover, if prosecuted for murder and for violating the coroner notification statute, Merritt could not both claim to be the anonymous caller and still credibly argue he was uninvolved in Fox's murder.

The State argues that the coroner notification statute did not expose Merritt to a realistic threat of self-incrimination. It likens the coroner notification statute to Washington's hit-and-run statute, RCW 46.52.020, which requires drivers involved in an accident to stop at the scene and provide their name, address, vehicle license number, and driver's license information. The State notes that the Washington Supreme Court upheld the hit-and-run statute as not violating the right against self-incrimination. *State v.*

27

*Engstrom*, 79 Wn.2d 469, 476-77, 487 P.2d 205 (1971).  We are not persuaded by the State's argument.

The *Engstrom* court's holding relied on the United States Supreme Court's holding in *California v. Byers*, 402 U.S. 424, 91 S. Ct. 1535, 29 L. Ed. 2d 9 (1971), which upheld California's hit-and-run statute as not violating a defendant's right against self-incrimination.  *Engstrom*, 79 Wn.2d at 476-77.  In *Byers*, the Court explained that "[d]isclosure of name and address is an essentially neutral act" but that the right against self-incrimination bars compelling "communications" or "testimony."  *Byers*, 402 U.S. at 432-33.  "'[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate to a factual assertion or disclose information.'"  *State v. Barry*, 183 Wn.2d 297, 309, 352 P.3d 161 (2015) (quoting *Doe*, 487 U.S. at 210).

In both *Engstrom* and *Byers*, the courts addressed broad facial challenges to the constitutionality of the statute, not as-applied challenges.  We are not concluding that the coroner notification statute is unconstitutional on its face.  In most cases, it is constitutional.  But not here.

Also, unlike neutral identification information required by the hit-and-run statute, the information required by the notification statute can be inherently inculpatory.  There are situations where only someone involved in a crime would know the location of human

28

remains. That is the situation here, where a person had been missing only a few days, was buried in a remote wooded area, and unlikely to be found by a casual wanderer. Requiring a person in this situation to disclose the location of human remains is inherently inculpatory.

### 2. Substantial penalties for exercising right

Merritt argues the State imposed a substantial penalty, criminal prosecution, and conviction for his refusal to incriminate himself by notifying an appropriate person of the location of Fox's body. We agree.

In *Flannery*, the court analyzed a defendant's facial self-incrimination challenge related to former RCW 9.41.800 (2019), which required the trial court to prohibit a person with a protection order against them from having firearms and required the court to order the person to surrender their firearms. 24 Wn. App. 2d at 470. When a person was ordered to surrender their firearms, they were required, within five days, to file proof of surrender and a receipt form or a declaration of nonsurrender attesting they did not possess firearms. *Id.* at 475-76 (citing former RCW 9.41.804 (2014)).

The State charged Flannery with assault, and the court entered an order prohibiting him from owning or possessing any firearms. *Id*. at 475. The effect of this order was immediate so that if he owned or possessed firearms, he would be guilty of a felony. *Id.*

The State also sought an order for Flannery to surrender his firearms. *Id.* Flannery objected and asked the trial court to find that he had a constitutional right against self-incrimination that entitled him to refrain from complying with the reporting requirements of the order to surrender weapons. *Id.* The trial court declined Flannery's request and ordered him to surrender his firearms. *Id.* When Flannery failed to comply with the reporting requirements within the statutory five days, the State filed a criminal charge against him for this failure. *Id.* at 476.

Flannery argued that the statutes violated his right against self-incrimination because it was unlawful for him to own or possess firearms when the no-contact order was entered, so a later order to surrender weapons and sign a declaration would force him to incriminate himself unless there was some grant of immunity for him. *Id.* The trial court agreed and determined that the statutes violated Flannery's right against self-incrimination. *Id.* at 477.

On appeal, we agreed with the trial court. *Id.* at 486. Addressing the second prong of the self-incrimination analysis, we concluded that the State sought substantial penalties for Flannery exercising his right against self-incrimination because the State could and did file a criminal charge against him for noncompliance with the reporting requirement. *Id.* at 480-84.

30

Merritt argues that we should apply the *Flannery* court's reasoning here. We find

*Flannery* persuasive and agree. The State charged and obtained a conviction for Merritt's

failure to notify the coroner of the location of Fox's body. The conviction constitutes a

substantial penalty for Merritt exercising his right against self-incrimination.

The State attempts to distinguish *Flannery* and argues that *State v. Juarez DeLeon*,

185 Wn.2d 478, 374 P.3d 95 (2016), is more analogous. In *Juarez DeLeon*, the

defendants answered questions from jail staff about their past or current gang affiliation

as part of the jail booking process. *Id*. at 486. As part of the process, a corrections

officer filled out a "Gang Documentation Form" if an inmate indicated there was

someone they could not be safely housed with. *Id*. at 484. Our Supreme Court held that

the admission of the statements from the documentation form at trial violated the

defendants' right against self-incrimination but noted that the act of asking the questions

did not violate the right. *Id*. at 487.

The State points out that the *Flannery* court distinguished *Juarez DeLeon* when it

noted that the firearm surrender process contained a crucial step missing in *Juarez*

*DeLeon*—"the State's compulsion of the answer. A person under a firearm surrender

order was required to comply with the order or be subjected to criminal penalties."

24 Wn. App. 2d at 483. "No such compulsion or punishment from the State existed in *Juarez DeLeon*." *Id.*

The State argues that Merritt was not compelled to file any information in the court or to comply with a court order, and *Flannery*'s reasoning should be limited to situations where a State actor actively asks a question. We disagree and decline to construe the right against self-incrimination in such a narrow manner. We liberally construe the right against self-incrimination. *Easter*, 130 Wn.2d at 236. The coroner notification statute compelled Merritt to notify the coroner, medical examiner, or law enforcement of the location of Fox's body. That notification posed a realistic threat that Merritt would incriminate himself as being involved in Fox's murder and the concealment of his body, and the State actually charged him with both offenses.

Last, the State advances the argument that "[u]nlike here, where a person reports the location of a body and the statement is actually used at trial, that statement presents a stronger claim of a violation of the privilege against self-incrimination." Am. Br. of Resp't at 24. This exact argument was analyzed and dismissed in *Flannery*. 24 Wn. App. at 482-85. Although Flannery invoked the privilege at the outset of his trial, unlike Merritt, we still must construe the right against self-incrimination liberally. An individual does not need to incriminate himself in order to invoke the privilege but, instead, may

simply refuse to make any statements that place him at risk. *United States v. Antelope*, 395 F.3d 1128, 1134 (9th Cir. 2005). The right against self-incrimination "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution *or could lead to other evidence that might be so used.*" *Kastigar*, 406 U.S. at 444-45 (emphasis added).

We hold that the coroner notification statute, as applied to the facts of Merritt's case, violated his right against self-incrimination. We direct the trial court to vacate the conviction and dismiss the charge with prejudice. *See Flannery*, 24 Wn. App. 2d at 486.

LFOS AND INTEREST ON RESTITUTION

Merritt assigns error to the VPA and the DNA collection fees imposed by the sentencing court and argues they must be struck from his judgment and sentence due to recent legislation. In addition, he argues the sentencing court should exercise its discretion to waive interest on restitution on remand due to recent legislation. We agree and address his arguments separately.

*VPA*

Under former RCW 7.68.035(1)(a) (2018), the sentencing court was required to impose a VPA on any individual found guilty of a crime. Effective July 1, 2023, the legislature amended RCW 7.68.035 to preclude superior courts from imposing a

33

VPA on a defendant who, at the time of sentencing, is found to be indigent as defined in RCW 10.01.160(3). *See* LAWS OF 2023, ch. 449, § 1(4). Statutory amendments related to LFOs imposed upon conviction generally apply to all cases pending on direct appeal that are not yet final. *See, e.g.*, *State v. Wemhoff*, 24 Wn. App. 2d 198, 201-02, 519 P.3d 297 (2022); *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018).

Merritt's case is pending on direct appeal and is not yet final; the record shows that the sentencing court found him to be indigent. Therefore, the amended statute applies, and we direct the sentencing court to strike the VPA from his judgment and sentence.

### *DNA collection fee*

Similarly, under former RCW 43.43.7541 (2018), the sentencing court was required to impose a DNA collection fee of $100 for every sentence imposed for the crimes specified in RCW 43.43.754. Effective July 1, 2023, the legislature amended RCW 43.43.7541 by removing language that made imposition of the DNA collection fee mandatory. *See* LAWS OF 2023, ch. 449, § 4. Again, the new statute applies to Merritt's case because it is pending on direct appeal. We therefore direct the sentencing court to strike the DNA collection fee from his judgment and sentence.

*Interest on restitution*

Under former RCW 10.82.090(1) (2018), the sentencing court was required to

impose interest on the restitution amount at the rate applicable to civil judgments.

Effective July 1, 2023, the legislature amended RCW 10.82.090(2) to provide:

> (2)  The court may elect not to impose interest on any restitution the court orders.  Before determining not to impose interest on restitution, the court shall inquire into and consider the following factors: (a) Whether the offender is indigent as defined in RCW 10.01.160(3) or general rule 34; (b) the offender's available funds, as defined in RCW 10.101.010(2), and other liabilities including child support and other legal financial obligations; (c) whether the offender is homeless; and (d) whether the offender is mentally ill, as defined in RCW 71.24.025.  The court shall also consider the victim's input, if any, as it relates to any financial hardship caused to the victim if interest is not imposed.  The court may also consider any other information that the court believes, in the interest of justice, relates to not imposing interest on restitution.  After consideration of these factors, the court may waive the imposition of restitution interest.

LAWS OF 2023, ch. 449, § 13.

In Merritt's case, the trial court imposed interest on the restitution amount of

$1,993.62.  However, because his direct appeal was pending at the time the change to

RCW 10.82.090 took effect, he is entitled to have the court consider whether to

impose interest on restitution based on the factors listed in the current version of

RCW 10.82.090(2).

SCRIVENER'S ERROR

Merritt contends that his judgment and sentence contains a scrivener's error. The State concedes. We conclude the error is moot.

Here, the jury convicted Merritt on count 8, failure to notify the coroner. However, the judgment and sentence incorrectly refers to that conviction as count 7. But because Merritt's unconstitutional conviction on that charge must be vacated, the scrivener's error is moot.

CONCLUSION

We affirm in part, reverse in part, and remand for resentencing. On remand, we direct the sentencing court to

1.     Vacate the convictions on counts 2 and 3, and remove any reference to them from the judgment and sentence.
2.     Vacate the conviction on count 4 and remove any reference to it from the judgment and sentence.
3.     Vacate the conviction on count 6 and dismiss the charge with prejudice.
4.     Vacate the conviction on count 8 and dismiss the charge with prejudice.
5.     Conduct a factual comparability analysis for Merritt's prior California conviction of unlawful taking of a vehicle.
6.     Strike the VPA and DNA collection fees from the judgment and sentence.
7.     Consider whether to impose interest on restitution based on the factors listed in RCW 10.82.090(2).

No. 38763-1-III
*State v. Merritt*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____, A.C.J.
Lawrence-Berrey, A.C.J.

WE CONCUR:

_____          _____
Pennell, J.                                               Staab, J.